UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IDC PROPERTIES, INC., )<br>        Plaintiff, )<br> )<br>    v.                                )<br> )<br>CHICAGO TITLE INSURANCE COMPANY, )<br>        Defendant. ) | C.A. No. 09-632-M |

**MEMORANDUM AND ORDER**

JOHN J. McCONNELL, Jr., United States District Judge.

Defendant Chicago Title Insurance Company (Chicago) issued a title insurance policy

(the Policy) to Plaintiff IDC Properties, Inc. (IDC) in connection with IDC's acquisition of

rights, title, and interests in Goat Island South, a waterfront condominium development located

in Newport, Rhode Island.   This real estate has spawned numerous cases and controversies.

Here, IDC seeks the $10 million Policy limit due to the loss of its rights, title, and interests in

certain parcels in Goat Island South because of rulings by the Rhode Island Supreme Court.

Chicago denied coverage and seeks summary judgment.

## I.   STANDARD OF REVIEW

"Summary judgment is appropriate only when 'there is no genuine issue as to any

material fact' and 'the moving party is entitled to a judgment as a matter of law.'"  *Sparks v.

Fidelity Nat'l Title Ins. Co.*, 294 F.3d 259, 265 (1st Cir. 2002)(quoting Fed. R. Civ. P. 56(c)).

The substantive law identifies the facts that are material.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment."  *Id.*  "In deciding a

summary judgment motion," this Court "must view the evidence in the light most favorable to

the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor." *Sparks*, 294 F.3d at 265.

## II. BACKGROUND

### A. Goat Island South – A Waterfront Condominium

The condominium development at issue originated in January of 1988 when a predecessor to IDC recorded a declaration of condominium for "Goat Island South – A Waterfront Condominium" (GIS) in Newport, Rhode Island. (ECF No. 51-3 at 2-93.) In March of 1988, a First Amended and Restated Declaration (Master Declaration) was recorded. (ECF No. 51-5 at 2-87.) The Master Declaration divides GIS into five Master Units: (i) the America Condominium; (ii) the Harbor Houses Condominium; (iii) the Capella Unit[1]; (iv) the Individual Unit (also known as the South Unit); and (v) Development Unit #1 (also known as the West Unit). *Id.* The Master Declaration defines the term "Master Unit" as "a physical portion of the Goat Island South Condominium designated for separate ownership or occupancy *or* designated as a Sub-Condominium, and described in Section 2.2." *Id.* at 6 (emphasis added). A "Master Association," a "Master Executive Board," and "Master Bylaws" govern GIS. *Id.* at 5-6. The term "Owner" is defined as "the Declarant[2] or other person or persons owning a Master Unit, which Master Unit is *not* a Sub-Condominium . . . ." *Id.* at 6 (emphasis added).

When the Master Declaration was recorded, the America Condominium, the Harbor Houses Condominium, and the Cappella Unit all contained buildings. (ECF No. 48 at 2; ECF No. 53 at 2.) In addition to being Master Units, America and Harbor Houses each were a "Sub-Condominium," meaning each is a "Master Unit of the Goat Island South Condominium that is

---

[1] The Capella Unit is also referred to as Capella South and Capella South Condominium.
[2] During the time period relevant to this action, the Declarant was IDC. (ECF No. 48 at 3; ECF No. 53 at 3.)

itself a condominium." (ECF No. 51-5 at 7; ECF No. 48 at 2; ECF No. 53 at 2.) Each "Sub-Condominium" has a "Sub-Association" comprised of "the Unit Owner's Association of a Sub-Condominium." *Id.* The term "Unit" is defined as "a physical portion of a Sub-Condominium designated for separate ownership or occupancy" and a "Unit Owner" is "the Declarant or other person or persons owning a Unit of a Sub-Condominium . . . ." *Id.* Each Sub-Condominium is governed by a "Sub-Association Board" composed of "Sub-Association Board Member[s]." *Id.* For example, the America Condominium is a Master Unit of GIS and also a "Sub-Condominium" containing one building with 46 "Units." (ECF No. 51-4 at 47-51.)

With several Master Units that are themselves Sub-Condominiums, GIS has a two-tiered governance system:  a Master Association and Master Executive Board govern GIS; and Sub-Associations and Sub-Association Boards govern Sub-Condominiums. (ECF No. 51-5.) The Master Declaration specifies that "[e]very person who is a record owner of a fee of undivided fee interest in any Master Unit or Unit in the Project shall be a member of the Master Association . . . ." (ECF No. 48-3 at 16.) The Master Bylaws state that "[n]otice of all meetings of the Master Association . . . shall be in writing to each Owner and Sub-Association Board Member . . . ." (ECF No. 51-5 at 37.) Voting at meetings is "by Owners and Sub-Association Board Members." *Id.* The Master Bylaws do not provide for Unit Owners to receive notice or to vote. *Id.*

In Article 6, the Master Declaration sets forth "Special Declarant and Development Rights." *Id.* at 18. For example, the Declarant reserves rights in connection with the Cappella Unit, Development Unit #1 (West Unit), and the Reserved Area (North Unit). *Id.* at 18-21. Section 6.2 states that the Declarant has through December 31, 1994 to construct improvements on Development Unit #1 (West Unit) and to submit it to a declaration of condominium, creating a Sub-Condominium of GIS containing no more than eight Units. *Id.* at 18. The Declarant also

reserved the right, through that same date, to convert it into a Master Common Element. *Id.* at 19. The Master Declaration explains that a "Master Common Element" includes grounds, gardens, utility equipment, and "other property normally in common use by Owners and Unit Owners." *Id.* at 11.

Article 6 of the Master Declaration also reserves for the Declarant certain rights with respect to the "Reserved Area" (North Unit). *Id.* at 20. Section 6.3 states that through December 31, 1994, the Declarant reserves the right to withdraw the Reserved Area from GIS. *Id.* The Declarant also reserves the right, through the same date, to convert it to a Master Unit owned by the Declarant. *Id.* If the Reserved Area was converted into a Master Unit by that date, then the Declarant also reserved the right to construct improvements and create a Sub-Condominium not exceeding 315 Units. *Id.* at 21.

Section 6.6, entitled "Amendment of Master Declaration," specifies that "[t]o exercise any development right reserved by the Declarant under this Article 6, the Declarant may, without the consent or vote of any Owner or Sub-Association Board Member, prepare, execute and record an amendment to this Master Declaration." *Id.* In contrast, Section 10.1, entitled "Amendment," specifies that "[e]xcept as otherwise provided herein and in [Chapter 36.1 of Title 34, General Laws of Rhode Island, 1956, as amended (the R.I. Condo Act)], this Declaration may be amended only by the vote of at least sixty-seven (67%) percent in voting interest of all Owners and Sub-Association Board Members, cast in accordance with the Master Bylaws." *Id.* at 28.

Exhibit X to the Master Declaration contains the First Amended and Restated Bylaws of GIS (Master Bylaws). *Id.* at 36. The Master Bylaws contain numerous provisions regarding the governance of the Master Association. *Id.* at 36-47. For example, the Master Bylaws set forth a

4

classification system for the members of the Master Executive Board and specifies that notices of Master Association Meetings go "to each Owner and Sub-Association Board Member." *Id.* at 37, 38-39. The Master Bylaws do not provide for notice to Unit Owners. *Id.*

### B.    Amendments To The Master Declaration

After the 1988 recording of the Master Declaration, the GIS condominium documents were amended numerous times. For example, in the First Amendment, the Declarant retained the right to construct improvements on the South Unit, the West Unit, and the Reserved Area, and also retained the right to convert the West Unit and Reserved Area into Sub-Condominiums. (ECF No. 48 at 2; ECF No. 53 at 2.)

The Third Amendment, recorded on June 13, 1994, extended through December 31, 1999 the Declarant's rights to withdraw the Reserved Area (North Unit) from GIS or to convert it into a Master Unit. (ECF No. 48-4 at 2-6.) If converted into a Master Unit, the Declarant had the right, through December 31, 1999, to construct improvements and create a Sub-Condominium containing at most 315 Units. *Id.* at 3-4. The Third Amendment specifies that it was passed "at a Special Meeting of the Master Association held on April 27, 1994" where "the Owners and Sub-Association Board Members, by a vote in excess of sixty-seven percent (67%)[3] in voting interest . . . , cast in accordance with . . . the Master Bylaws, . . . to extend the length of time within which the Declarant may exercise certain rights . . . ." *Id.* at 2.

The Fourth Amendment, recorded on December 23, 1994, extended through December 31, 1999 the time for the Declarant to construct improvements on Development Unit #1 (West Unit) and to convert it to a Sub-Condominium containing a maximum of eight Units. *Id.* at 7-10.

---

[3]   Section 10.1 of the Master Declaration states that the Master Declaration "may be amended only by the vote of at least sixty-seven (67%) percent in voting interest of all Owners and Sub-Association Board Members . . . ." (ECF No. 51-5 at 28.)

Like the Third Amendment, the Fourth Amendment states that at a Special Meeting of the Master Association, by a vote in excess of 67% in voting interest, the Owners and Sub-Association Board Members amended certain sections of the Master Declaration extending the time period within which the Declarant may exercise certain rights. *Id.* at 8.

The Fifth Amendment, recorded December 29, 1994, states, among other things, that the Declarant reserves its rights, through December 31, 2015, to construct improvements on Development Unit #1 (West Unit) and to create a Sub-Condominium there. *Id.* at 11-21. Regarding the Reserved Area (North Unit), the Declarant reserved the right, through December 31, 2015, to withdraw it from GIS or to convert it to a Master Unit, and if converted to a Master Unit, to construct improvements and create a Sub-Condominium containing at most 303 Units. *Id.* at 14-16.

The Sixth Amendment, also recorded December 29, 1994, states that the Declarant, acting pursuant to section 10.1 of the Master Declaration, converts the North Development Unit (formerly the Reserved Area) to a Master Unit. *Id.* at 22-27. Section 10.1 provides that "the Declarant or the Master Executive Board . . . may effect an appropriate amendment to the Master Declaration without the approval of any Owner of Sub-Association Board" in certain enumerated circumstances, such as when "an amendment . . . is necessary to the exercise of any development or other rights granted or reserved to the Declarant." (ECF No. 51-5 at 28.)

## C.    The Policy

On October 21, 1994, Chicago issued a $10 million American Land Title Association Owner's Policy, CTIC No. 946190133, to IDC. (ECF No. 48-13 at 10-19.) The Policy insured "against loss or damage, not exceeding [$10,000,000.00], sustained or incurred by [IDC] by reason of:" (i) "Title to the state or interest described in Schedule A being vested other than as

stated therein;" (ii) "Any defect in or lien or encumbrance on the title;" (iii) "Unmarketability of the title;" or (iv) "Lack of a right to access to and from the land." *Id.* at 10. Schedule A specifies that the Policy insured the following: "All right, title, and interest in . . . [t]he individual unit, developmental unit #1, and development and special declarant's rights in and to Goat Island South – A WATERFRONT CONDOMINIUM, as created by the Declaration of Condominium dated as of January 12, 1988 . . . ."[4] *Id.* at 14-15.

The Policy excludes several matters from coverage, such as: "Defects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to [Chicago], not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to [Chicago] by the insured claimant prior to the date the insured claimant became an insured under this policy; . . . [or] (d) attaching or created subsequent to Date of Policy; . . . ." *Id.* at 11.

The Policy contains numerous Conditions and Stipulations, such as a notice provision requiring IDC to notify Chicago

> *promptly in writing* (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which [Chicago] may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to [Chicago], then as to the insured all liability of [Chicago] shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify [Chicago] shall in no case prejudice the rights of any insured under this policy unless [Chicago] shall be prejudiced by the failure and then *only to the extent of the prejudice.*

---

[4]   The Policy also insured many enumerated Units within America Condominium, Harbor Houses Condominium, and Cappella South Condominium, but those Units are not at issue here. *Id.* at 15.

*Id.* at 12 (emphases added).   Section four provides Chicago with the right to institute and prosecute actions it finds may be necessary to establish title.  In section five, the Policy requires IDC to submit to an examination under oath (EUO) and to produce a variety of documents that reasonably pertain to the damage or loss.  *Id.*  Failure to do so may terminate Chicago's liability with respect to the claim.  *Id.*  And in section six, in the case of a claim, Chicago has options regarding paying or settling.  *Id.*

### D.      The Regatta Club And The Commonwealth Policy

In 1997, IDC began planning for the construction of a banquet facility on the Reserved Area (North Unit).  (ECF No. 52 at 3; ECF No. 57 at 3.)  In connection with this multi-million dollar investment, IDC sought title insurance.[5]  (ECF No. 52 at 3; ECF No. 57 at 3-4.)  In a one-page Memo dated December 15, 1997, IDC's counsel was informed by Chicago's counsel that Chicago was "not willing to insure the sub-condominium units within the North Development Unit" because of a disagreement regarding the clarity of the law on voting, threatened litigation, and expired development rights.  (ECF No. 51-7 at 31.)

A month later, IDC obtained a $7 million Owner's Title Insurance Policy from Commonwealth Land Title Insurance Company (Commonwealth) that insured the "North Development Unit" and specified Declarant's rights associated with it.  (ECF No. 48-11 at 34-36.)  In 1998, IDC built a function center called the Regatta Club on the North Unit.  (ECF No. 48 at 10; ECF No. 53 at 8.)  As the Regatta Club neared completion, IDC added endorsements to the Commonwealth policy increasing its limit to $12 million.  *Id.*

---

[5]  IDC characterizes this as "additional" title insurance for the North Unit (Reserved Area). (ECF No. 52 at 3.)  Chicago, consistent with its position that the North Unit was *not* covered by the Policy it issued in October of 1994, disputes that this new policy would have provided "additional" title insurance.  (ECF No. 57 at 3-4.)

In August of 2001, Commonwealth filed a declaratory judgment action in this Court. (ECF No. 48 at 19; ECF No. 53 at 14; *see also* ECF No. 1 in 01-cv-400; *Commonwealth Land Title Ins. Co. v. IDC Props., Inc.*, 524 F.Supp.2d 155 (D.R.I. 2007).)  In December of 2007, the Commonwealth policy was declared void because "IDC 'knowingly failed to disclose' to Commonwealth" that Chicago cited threatened litigation challenging IDC's developments rights "as one of its reasons for declining to provide coverage." *Commonwealth Land Title Ins. Co. v. IDC Props., Inc.*, 547 F.3d 15, 20 (1st Cir. 2008) (quoting *Commonwealth Land Title Ins. Co. v. IDC Props., Inc.*, 524 F.Supp.2d 155, 162-62 (D.R.I. 2007)).  The First Circuit affirmed the voiding of the policy. *Id.* at 23.

### E.     Other Litigation

Several judges in several courts have issued opinions and orders related to GIS. *See, e.g.*, *In re IDC Clambakes, Inc.*, --- F.3d ---, No. 12-1710, 2013 WL 4081901 (1st Cir. Aug. 14, 2013).  Only those of significance to the pending motion are discussed below.

#### 1.     State Court

Two R.I. Supreme Court opinions spawned IDC's litigation here: *America Condominium Association, Inc. v. IDC, Inc.*, 844 A.2d 117 (R.I. 2004) (*ACA I*); and *America Condominium Association, Inc. v. IDC, Inc.*, 870 A.2d 434 (R.I. 2005) (*ACA II*).  Both R.I. Supreme Court opinions originate from  a seven-count complaint filed in 1999 in Rhode Island Superior Court, Newport County, by three condominiums — America, Capella South, and Harbor House — against three defendants — IDC, Island Development Corporation, Inc., and their president, Thomas R. Roos. *ACA I* at 119; *ACA II* at 436; ECF No. 51-8 at 18-35.

Before this lawsuit was filed, Mr. Roos corresponded with plaintiff condominium associations, suggesting that they submit their disputed issues to arbitration. (ECF No. 48 at 8, 9;

ECF No. 53 at 7.)   The parties participated, unsuccessfully, in approximately ten mediation sessions. (ECF No. 48 at 9; ECF No. 53 at 7.)   After those sessions, the parties then agreed to submit their disputes to a non-binding arbitrator and in 1998 entered into a tolling agreement.[6] (ECF No. 48 at 9-10; ECF No. 53 at 7.)

In their Superior Court complaint, plaintiff condominium associations "maintained that the defendants had improperly extended their development rights on certain areas of common property within the condominium complex and that because these development rights actually had expired, title to the common property now vested in the plaintiffs in fee simple." *ACA I* at 119. The parties sought summary judgment. (ECF No. 51-9 at 9-21.)

The Superior Court ruled in favor of the condominium associations, granting partial summary judgment and finding that the Third, Fourth, and Fifth Amendments were void ab initio because the voting procedures used to adopt those amendments did not comply with R.I. Gen. Laws § 34-36.1-2.17(d).  *Id.* at 16-17, 20.   Specifically, the Superior Court found that "[i]n order for a declarant to lawfully increase its special declarant rights, it must first obtain the unanimous consent of the unit owners in support of such an amendment." *Id.* at 17.   Further, it found inapplicable the one year statute of limitations for challenging an amendment and refused to entertain defendants' equitable laches defense because the parties entered into a tolling agreement. *Id.* at 19, 20.  Finally, the Superior Court concluded that defendants' right to develop Goat Island had expired, the alleged voting rights were null and void, and the Master Association lacked legal authority to act on behalf of the unit owners. *Id.* at 20.  Both sides appealed. *ACA I* at 119.

---

[6]  IDC did not provide notice to Chicago of the arbitration proposal or tolling agreement.  (ECF No. 48 at 10; ECF No. 53 at 7.)

*ACA I*

In *ACA I*, the R.I. Supreme Court affirmed the R.I. Superior Court's decision "declaring that the Third, Fourth and Fifth Amendments were void *ab initio*" due to "the voting procedure employed at the special meetings." *Id.* at 130. The R.I. Supreme Court found that the declarant's development rights in the South Unit, the West Unit, and the Reserved Area "automatically expired when the declarant failed to exercise them on or before December 31, 1994." *Id.* at 130, 131.

Focusing on the Third, Fourth, and Fifth Amendments, the R.I. Supreme Court explained that "[t]hese amendments purportedly extended IDC's deadline to develop the South and West Development Units and to exercise its rights to the Reserved Area from December 31, 1994, to December 31, 1999." *Id.* at 128. The R.I. Supreme Court reasoned that IDC's development rights in these units are "special declarant rights" as that term is defined by R.I. Gen. Laws § 34–36.1–1.03(26). *Id.* at 129. Consequently, any amendments extending these "special declarant rights" had to comply with "the statutory requirement that unanimous consent of the owners be obtained pursuant to § 34–36.1–2.17(d)."[7] *Id.* Although IDC argued that this mandate meant that it needed the unanimous consent of the master condominium unit owners, the R.I. Supreme Court interpreted it as requiring the unanimous consent of the owners of the sub-condominium units. *Id.* at 129-30.

While the Master Declaration distinguishes between an "Owner" (owner of a Master Unit) and a "Unit Owner" (owner of Unit of a Sub-Condominium), the R.I. Condo Act does not

---

[7]  Section 34–36.1–2.17(d) states: "Except to the extent expressly permitted or required by other provisions of this chapter, no amendment *may create or increase special declarant rights*, increase the number of units, change the boundaries of any unit, the allocated interests of a unit, or the uses to which any unit is restricted, in the absence of *unanimous consent* of the unit owners." (Emphases added.)

make such a distinction — it speaks only of a "Unit owner," a person who owns a unit in a condominium. (*Compare* ECF No. 51-5 at 6, 7 *with* R.I. Gen. Laws § 34-36.1-1.03(28), (29); *see also ACA I* at 129-30.)   The R.I. Supreme Court concluded that the definition of "Unit owner" in the R.I. Condo Act includes those who own a unit of a sub-condominium, "Unit Owners" in GIS vernacular. *ACA I* at 130; ECF No. 51-5 at 7.   Not only did the procedures employed to pass the Third, Fourth, and Fifth Amendments violate the R.I. Condo Act, but so too did the Master Declaration itself because its "voting scheme" permitted amendments to special declarant rights by a 67 percent vote of (Master Unit) Owners and Sub-Association Board Members, in violation of the R.I. Condo Act's requirement of unanimous consent of the individual Unit Owners. *Id.* at 130; *see also* ECF No. 51-5 at 28.

Focusing on the Reserved Area, the R.I. Supreme Court noted that on December 29, 1994, the declarant recorded the Sixth Amendment, purporting to convert the Reserved Area "into a declarant-owned master unit with associated development rights." *Id.* at 131.   Even though plaintiff condominium associations had not challenged the Sixth Amendment, the R.I. Supreme Court determined that the development rights in the Reserved Area "automatically expired" on December 31, 1994 because the declarant had failed to exercise them. *Id.* at 131.

Turning to the ownership of the three disputed parcels, in Section VI the R.I. Supreme Court "conclude[d] that when the associated development rights expired, so also did all of the declarant's rights in the master units." *Id.* at 133.   As such, "title to the disputed property vested in the individual unit owners in fee simple." *Id.*   Finally, the R.I. Supreme Court found that the Superior Court had not erred in its conclusions regarding either the limitations period or laches. *Id.* at 133-34.

*ACA II*

Defendants petitioned for reargument of *ACA I*. *ACA II* at 435.   The R.I. Supreme Court

granted their petition "limited to the title/ownership issued raised in the petition and addressed by

this Court in Section VI" of *ACA I*. *Id*.   In *ACA II*, the R.I. Supreme Court both reaffirmed its

holdings in *ACA I* "in their entirety" and "clarif[ied] certain aspects of" *ACA I*. *Id*. at 436.

Regarding the South and West Units, the R.I. Supreme Court noted that the Master Declaration,

recorded in 1988, deemed these parcels "Master Units." *Id*. at 436, 439-40.   However, the R.I.

Supreme Court found that "no structural components were located on either [the South Unit or

the West Unit] in 1988 that met the requirements of 'substantial completion' that the [R.I.

Condo] Act cites as a prerequisite for recording a declaration of condominium." *Id*. at 440

(referencing R.I. Gen. Laws § 34–36.1–2.01(b)).   Since they failed the satisfy the "substantial

completion" prerequisite, "the South and West Units never were validly created units within the

meaning of the [R.I. Condo] Act, they were, and remain, common elements." *Id*.   Regarding the

North Unit, the R.I. Supreme Court noted that IDC had reserved development rights and

attempted to exercise those rights "by executing and recording" the Sixth Amendment. *Id*. at

441.   The R.I. Supreme Court found that this amendment also did not comply with the

"substantial completion requirement of the [R.I. Condo] Act in effect in 1988."[8]   *Id*.

Consequently, the R.I. Supreme Court determined "that IDC [] and its predecessors failed to

create units in the South, West, and North areas of the Goat Island South Condominium." *Id*. at

442.   Finally, the R.I. Supreme Court concluded that because the South, West, and North Units

were not validly created, then "these portions of the condominium always were, and remain,

common elements." *Id*. at 442.

---

[8]   The R.I. Supreme Court further noted that the amendment did not comply with a 1991
amendment to the R.I. Condo Act providing for "land-only units." *Id*.

### 2. Federal Court

On March 28, 2006, while the *ACA* litigation was proceeding in state court, IDC filed a third-party complaint in this Court against its former counsel, Edwards Angell Palmer & Dodge, LLP and a partner there (collectively, EAPD) for indemnification, breach of fiduciary duty, and breach of contract. (ECF No. 51-11 at 89-92; ECF No. 33 in 01-cv-400.) IDC alleged that it had relied on its counsel to obtain a title insurance policy in connection with its development of the North Unit, and further relied on the existence of the $12 million policy and the coverage it provided. *Id.* EAPD sought summary judgment for two reasons: (i) the legal malpractice action was barred by the statute of limitations; and (ii) even if the claim captioned as indemnification was not time barred, IDC could not establish two requisite elements. (ECF No. 69 in 01-cv-400.) After a hearing on September 13, 2007, another judge in this Court issued an order granting EAPD's motion for summary judgment. (ECF No. 94 in 01-cv-400.)

### F. This Litigation

On July 8, 2005, IDC sent a letter to Chicago providing notice of a "claim for loss and/or damage" under the Policy. (ECF No. 51-11 at 8-9.) The letter stated that "IDC's claim against the Policy arises as a result of that certain decision of the Rhode Island Supreme Court, dated April 8, 2005, which adversely impacted IDC's right, title and/or interest in the real property described, and covered, by the Policy." *Id.* at 8.

By letter dated August 11, 2006, counsel for Chicago informed IDC that it wanted to examine IDC under oath concerning IDC's claim. (ECF No. 48-24 at 27.) During the remainder of 2006 and 2007, attorneys for IDC and Chicago exchanged numerous communications regarding scheduling the EUO. *Id.* at 28-37.

By letter dated January 28, 2009, Chicago denied coverage for IDC's claim. (ECF No. 48-24 at 38-46.) This letter contains several reasons why Chicago was denied coverage: (i) IDC breached its obligations under the Policy by failing to complete an EUO; (ii) IDC prejudiced Chicago by submitting late notice; (iii) the Policy does not cover IDC's interests in the North Unit; and (iv) claims regarding amendments to the condominium documents adopted after the Policy issued are not covered. *Id.* at 41-45.

On December 1, 2009, IDC filed a four count complaint against Chicago in Newport County Superior Court; Chicago removed the matter to this Court. (ECF Nos. 1-1, 1-2, 6.) Chicago answered and a scheduling order entered. (ECF Nos. 7, 12.) After two district judges recused, the matter was assigned to this judge. (ECF Nos. 21, 44.) Following the close of discovery, Chicago has moved for summary judgment. (ECF No. 46.)

## III.   ANALYSIS

### A.   The North Unit

Chicago first focuses on the North Unit, arguing that it not covered by the Policy. Even if the North Unit is covered, Chicago contends that IDC's claims are barred by exclusions in the Policy. IDC responds that the Policy insured its development and special declarant rights in and to GIS, including in the Reserved Area (North Unit), and its losses are not excluded from coverage.

#### 1.   Coverage

Chicago proffers several arguments as to why the Policy does not cover the North Unit. Regarding the language of the Policy, Chicago makes two arguments:  (i) the Policy does not reference the Reserved Area (ECF No. 47 at 17-19); and (ii) the phrase "development and special

declarant rights" "only refers to those rights in the five units[9] which IDC held title to *as of the date of the Policy*, which did not include the North Unit." (ECF No. 56 at 9-11.)  IDC counters by arguing that the Policy insured its development and special declarant rights with respect to GIS, including its rights associated with the Reserved Area (North Unit). (ECF No. 51-1 at 22-24, 26-28.)

It is an undisputed fact that the North Unit, initially referred to as the Reserved Area, is not mentioned by name in the Policy. (ECF No. 48 at 3-4; ECF No. 53 at 3.)  Also undisputed is that the Policy insures "development and special declarant rights in and to the GIS Condominium." *Id.*  Schedule A of the Policy describes what it insures:  "All right, title, and interest in . . . [t]he individual unit, developmental unit #1, and *development and special declarant's rights in and to Goat Island South – A WATERFRONT CONDOMINIUM*, as created by the Declaration of Condominium dated as of January 12, 1988 . . . ." (ECF No. 48 at 14-15)(emphasis added).  The parties dispute the meaning of the phrase "and development and special declarant's rights in and to Goat Island South – A WATERFRONT CONDOMINIUM."

Rhode Island courts interpret the terms of an insurance policy "according to the same rules of construction governing contracts.'"  *RGP Dental, Inc. v. Charter Oak Fire Ins. Co.*, No. 04-445-ML, 2005 WL 3003063, at *2 (D.R.I. Nov. 8, 2005)(quoting *Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc.*, 860 A.2d 1210, 1215 (R.I. 2004)).  "The courts 'look at the four corners of a policy, viewing it in its entirety, affording its terms their plain, ordinary and usual meaning.'"  *Id.* (internal quotation marks and citation omitted); *see also Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999 (R.I. 1989).  "When ascertaining the usual and ordinary meaning of

---

[9]   Those five units are the Individual Unit (South Unit), Development Unit #1 (West Unit), America Condominium, Harbor House Condominium, and Capella South Condominium. (ECF No. 47 at 21; ECF No. 48-13 at 14-15.)

contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected." *Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 239 (R.I. 2004).

The Policy's phrase "development and special declarant's rights in and to [GIS]" must be given its plain, ordinary, and usual meaning. The R.I. Condo Act defines "development rights" as "any right or combination of rights reserved by a declarant in the declaration to: (A) Add real estate to a condominium, (B) Create units, common elements, or limited common elements within a condominium, (C) Subdivide units or convert units into common elements, or (D) Withdraw real estate from a condominium." R.I. Gen. Laws § 34-36.1-1.03(11). Article 6 of the Master Declaration is entitled "Special Declarant and Development Rights." (ECF No. 51-5 at 18.) It contains reservations of rights that are defined by the R.I. Condo Act as "development rights." For example, Article 6 sets forth various rights reserved to the Declarant, such as the right to convert the Capella Unit into a condominium and the right to withdraw the Reserved Area (North Unit) from GIS. *Id.* at 18-22. Article 6 specifies Special Declarant and Development Rights in connection with four parcels: (i) Capella Unit (§ 6.1); (ii) Development Unit #1 (West Unit) (§ 6.2); (iii) Reserved Area (North Unit) (§ 6.3); and (iv) America Condominium (§ 6.5). *Id.* at 18-21. Article 6 also contains procedures regarding exercising development rights (§ 6.4) and amending the Master Declaration (§ 6.6). *Id.* at 21.

When the Policy issued in October of 1994, the Master Declaration had been recorded, as had the Third Amendment. (ECF No. 51-5 at 2-87; ECF No. 48-4 at 1-6.) The Third Amendment modified Sections 6.3 and 6.8 of the Master Declaration, extending IDC's development and special declarant rights in the Reserved Area (North Unit) through December 31, 1999. (ECF No. 48-4 at 1-6.)

17

This Court disagrees with Chicago's contention that the phrase "development and special declarant rights" is somehow confined to rights associated with the five parcels listed in the Policy. The Policy language at issue — "and development and special declarant's rights in and to GOAT ISLAND SOUTH – A WATERFRONT CONDOMINIUM. . . " — does not support this contention because it contains no such phraseology or limitation. As IDC pointed out at oral argument, Chicago's interpretation of the Policy would make sense only if the entire phrase "and development and special declarant's rights in and to GOAT ISLAND SOUTH – A WATERFRONT CONDOMINIUM . . ." was eliminated from the Policy. The language is there, and it has meaning.

Chicago has failed to convince this Court that the Policy insured "development and special declarant's rights" only in connection with certain parcels. The Policy states that "development and special declarant's rights in and to [GIS]" are covered. This Court finds that the plain meaning of the term "development and special declarant's rights in and to GOAT ISLAND SOUTH – A WATERFRONT CONDOMINIUM" is just what it says, development and special declarant's rights in and to GIS. Those rights, as enumerated in the Master Declaration and Third Amendment, include IDC's rights in and to the Reserved Area (North Unit).[10] Therefore, based on the language of the Policy, Chicago is not entitled to summary judgment regarding coverage of the Reserved Area (North Unit).

Moreover, even if this Court were to find that the Policy contains an ambiguity or could reasonably be interpreted in multiple ways, it would still deny summary judgment. Under Rhode

---

[10]   In *Commonwealth Land Title Ins. Co. v. IDC Props., Inc.*, a decision regarding the Commonwealth policy, the First Circuit stated that "[t]he [Chicago] policy did not cover the Reserved Area, later the North Unit." 547 F.3d 15, 17 (1st Cir. 2008). However, this statement did not represent a specific finding by the First Circuit and was not in any way a finding necessary to the issues before the Court of Appeals at that time.

Island law, if the terms of an insurance policy contain an "ambiguity" or "are subject to more than one reasonable interpretation," then the policy "will be strictly construed against the insurer." *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 552 (R.I. 1990). Here, that would mean construing the Policy against Chicago. Although this Court does not find the language ambiguous or susceptible to multiple interpretations, if it did, it would construe the language against Chicago, finding coverage for IDC's "development and special declarant's rights" in the entire GIS as opposed to confining the Policy's application to IDC's "development and special declarant's rights" in five parcels. Since this Court need go no further than the four corners of the Policy, it need not reach Chicago's additional arguments regarding whether the Policy encompasses the Reserved Area (North Unit).

### 2.   Exclusions

Chicago further argues that even if the Policy insured IDC's development rights in the North Unit, summary judgment is appropriate because the Policy excludes coverage for claims (i) created by IDC; (ii) known to IDC but not disclosed in writing to Chicago; and (iii) arising from the Fifth or Sixth Amendments to the condominium documents because those amendments were recorded after the Policy issued. (ECF No. 47 at 22-28; ECF No. 56 at 13-19.) IDC responds that the defects giving rise to its insured loss "existed *prior* to issuance of the Policy." (ECF No. 51-1 at 27.) IDC maintains that its loss stems from R.I. Supreme Court's finding invalid both the Master Declaration's title structure and the Third Amendment, and notes that both documents were recorded in the public record prior to the issuance of the Policy. *Id.* at 27-28.

"Where an insurance company seeks to deny coverage under a policy exclusion, it carries the burden of proving that the exclusion applies." *Am. Title Ins. Co. v. East West Fin.*, 16

F.3d 449, 455 (1st Cir. 1994).  "Exclusionary clauses in insurance contracts are strictly interpreted." *Allstate Ins. Co. v. Greloch*, No. 11-015-ML, 2011 WL 4351630, at *3 (D.R.I. Sept. 14, 2011)(citing *Ricci v. United States Fidelity & Guar. Co.*, 290 A.2d 408, 413 (1972)). An insurance policy's exclusion from coverage "must be clear and unambiguous." *Scorpio v. Underwriters at Llyod's, London*, No. 10-325-ML, 2012 WL 2020168, at *3 (D.R.I. June 5, 2012)(quoting *Am. Commerce Ins. Co. v. Porto*, 811 A.2d 1185, 1192 (R.I. 2002)).

The Policy contains several "Exclusions From Coverage."  (ECF No. 48-13 at 11.) Paragraph 3 excludes "Defects, liens, encumbrances, adverse claims or other matters:   (a) *created*, suffered, assumed or agreed to by the insured claimant; (b) not known to [Chicago], not recorded in the public records at Date of Policy, but *known to the insured claimant and not disclosed in writing* to [Chicago] by the insured claimant prior to the date the insured claimant became an insured under this policy; . . . [or] (d) attaching or created *subsequent to Date of Policy*; . . . ." *Id.* (emphases added).

Chicago's first two arguments involve the Third Amendment.  The Third Amendment extended through December 31, 1999 IDC's right to withdraw the Reserved Area (North Unit) from GIS, convert it to a Master Unit and, if converted, to construct a Sub-Condominium. (ECF No. 48-4.)  The Third Amendment was recorded on June 13, 1994, several months before Chicago issued the Policy on October 21, 1994. (ECF No. 48-4 at 6; ECF No. 48-13 at 14.)

### a.   Exclusion 3(a):  Created

Under Policy exclusion 3(a), if "[d]efects, liens, encumbrances, adverse claims or other matters" were "created, suffered, assumed or agreed to by [IDC]," then they are excluded from coverage. (ECF No. 48-13 at 11.)  Chicago contends that IDC created its own loss by failing to timely exercise its rights in accordance with the R.I. Condo Act, so IDC's claims should be

excluded from coverage. (ECF No. 47 at 22; ECF No. 56 at 14.) From IDC's perspective, the latent defect in the condominium documents, including the Third Amendment and its deadline, give rise to its loss, so the loss is not excluded. (ECF No. 51-1 at 26.)

In *ACA I*, the R.I. Supreme Court made several rulings relevant to the North Unit (Reserved Area): (i) the Third Amendment was "void *ab initio*" due to "the voting procedure employed," *ACA I* at 130; (ii) the declarant's development rights in the Reserved Area "automatically expired when the declarant failed to exercise them on or before December 31, 1994," *id.* at 131; (iii) the Master Declaration itself violated the R.I. Condo Act's requirement of unanimous consent of individual unit owners for any amendments extending "special declarant rights," *id.* at 130; and (iv) even though the propriety of the Sixth Amendment was not challenged, the development rights in the Reserved Area "automatically expired" on December 31, 1994 because the declarant had failed to exercise them. *Id.* at 131.

According to Chicago, the Third Amendment's invalidation by the R.I. Supreme Court is the "sole basis for IDC's claim against Chicago Title for a loss stemming from the North Unit." (ECF No. 47 at 23.) A review of *ACA I* and *ACA II* reveals that this is not the case.[11] IDC's loss of the North Unit was caused, at least in part, by the R.I. Supreme Court's determination that the Master Declaration's "voting scheme" contravened the R.I. Condo Act. The Master Declaration

---

[11] This Court is unpersuaded by Chicago's reliance on *City of East Providence v. First American Title Insurance Co.*, No. 10-199-ML, 2011 WL 5527604, at *3 (D.R.I. Nov. 14, 2011), a case where the City "deliberately engaged in a transaction [with GeoNova Development Company LLC] that provided a basis for claims against such title." In *City of East Providence*, there was no record evidence "that the City's title suffered from a defect at the time the City acquired the Property . . . ." *Id.* at *2. Rather, it was the City's entrance into agreements requiring it to "acquire title to the Property as nominee for GeoNova" that "provided a basis for claims against such title." *Id.* at *3. The magistrate judge in *City of East Providence* found "that by its very nature, GeoNova's claim of an interest in the Property adverse to the City has its beginning and end in the documents executed between them—not in anything recorded in the chain of title to the Property." *Report & Recommendation*, 2011 WL 5521246, at *5 (D.R.I. Oct. 13, 2011)(adopted in its entirety on Nov. 14, 2011).

contained IDC's development and special declarant's rights, specified who needed to vote, and instructed IDC how to exercise its development and special declarant's rights.  IDC followed the dictates of the Master Declaration and its "voting scheme" when it recorded the Third Amendment, a document on its face extending through December 31, 1999 IDC's development and special declarant's rights in the Reserved Area.  The R.I. Supreme Court's invalidation of the Master Declaration's "voting scheme," caused, at least in part, IDC's loss of development and special declarant's rights in the North Unit (Reserved Area).

Having failed to meet its burden to show that the cause for the loss of the North Unit was "created" by IDC, Chicago is not entitled to summary judgment in connection with paragraph 3(a) of the Policy's exclusions.

### b.    Exclusion 3(b):  Disclosed

Under Policy exclusion 3(b), "[d]efects, liens, encumbrances, adverse claims or other matters" that were "not known to [Chicago], not recorded in the public records at Date of Policy, but known to [IDC] and not disclosed in writing to [Chicago] by the insured claimant prior to the date [IDC] became an insured under this policy . . ." are excluded.  (ECF No. 48-13 at 11.) Chicago argues that IDC knew, but did not disclose *in writing* to Chicago prior to the date of the Policy, that IDC failed to provide proper notice and used an improper voting procedure in connection with the passage of the Third Amendment.  (ECF No. 47 at 25.)  Chicago further argues that "IDC made a material misrepresentation or omission in its application for insurance" because in April 1994 an individual unit owner shared with IDC's director, shareholder, and officer Thomas Roos his belief that that individual unit owners should be able to vote on the Third Amendment.  (ECF No. 56 at 17-19; ECF No. 58-1; ECF No. 48 at 3; ECF No. 53 at 3.) IDC maintains that "the latent defect found in the condominium documents at the time Chicago

22

Title issued the Policy, including the 3rd Amendment (and its deadline)" gives rise to its losses. (ECF No. 51-1 at 23-26.)

Three documents recorded in the public record before the Policy issued pertain to this Court's analysis: (i) the Third Amendment; (ii) the Master Declaration; and (iii) the Master Bylaws. The Third Amendment was recorded in the public record on June 13, 1994, prior to the issuance of the Policy. (ECF No. 48-4 at 1-6; ECF No. 48-13 at 14.) The Third Amendment states

> at a Special Meeting of the Master Association held on April 27, 1994, the Owners and Sub-Association Board Members, by a vote in excess of sixty-seven percent (67%) in voting interest of all Owners and Sub-Association Board Members, cast in accordance with the provisions of the Master Bylaws, duly voted to amend Section 6.3 and Section 6.8 of the [Master] Declaration to extend the length of time within which the Declarant may exercise certain rights set forth in such sections; . . . .

(ECF No. 48-4 at 2.) The Master Declaration was recorded in the public record prior to the issuance of the Policy. (ECF No. 51-5 at 87; ECF No. 48-13 at 14.) Section 10.1 of the Master Declaration states "[e]xcept as otherwise provided herein and in the [R.I. Condo] Act, this Declaration may be amended only by the vote of at least sixty-seven (67%) percent in voting interest of all Owners and Sub-Association Board Members, cast in accordance with the provisions of the Master Bylaws." *Id.* at 28. Finally, Exhibit X to the Master Declaration contains the Master Bylaws. *Id.* at 36. The Master Bylaws were recorded in the public record before the Policy issued. (ECF No. 51-5 at 87; ECF No. 48-13 at 14.) The Master Bylaws specify that notices of all Master Association meetings go "to each Owner and Sub-Association Board Member." *Id.* at 37. The Master Bylaws do not provide for notice to Unit Owners. *Id.*

Based on information available in the public record before it issued the Policy, Chicago was on notice that Unit Owners would not and did not receive notice of meetings held in

connection with the Third Amendment. Chicago was also on notice that only Owners and Sub-Association Board Members, terms defined in the Master Declaration, voted on the Third Amendment. When Chicago issued the Policy, the public record contained all the information necessary to conclude, as the R.I. Supreme Court did in *ACA I* and *ACA II*, that GIS's voting procedure violated the R.I. Condo Act. Consequently, Chicago cannot exclude IDC's claim on the basis that IDC did not disclose the voting procedure because it was "recorded in the public records at Date of Policy."

Finally, this Court must address the argument in Chicago's reply that an individual Unit owner telling Mr. Roos that he believed Unit owners should vote constitutes a material misrepresentation or omission. (ECF No. 56 at 17-19.) "[A] material misrepresentation in an insurance application makes voidable, without a concomitant demonstration of fraud, an insurance contract that is issued upon the application." *Evora v. Henry*, 559 A.2d 1038, 1040 (R.I. 1989). In this analysis, "a failure to disclose material facts is treated in the same way as an affirmative misrepresentation." *Commonwealth Land Title Ins. Co. v. IDC Props., Inc.*, 524 F.Supp.2d 155, 162 (D.R.I. 2007). Chicago, "an insurer denying coverage on the ground of misrepresentation[,] bears the burden of proving that there was a misrepresentation or omission and that it was *material* to the insurer's decision to issue the policy." *Id.* (emphasis added). The "critical inquiry is whether the misrepresentation [or omission] caused the insurer to issue a policy that the insurer, otherwise, would have refused to issue." *Id.*

At the time the Policy issued, the public record contained the Master Declaration, the Master Bylaws, and the Third Amendment, putting Chicago on notice of GIS's voting procedure. The record before this Court, viewed in the light most favorable to IDC, does not permit this Court to conclude that if Chicago had known that one Unit Owner shared his belief that Unit

Owners should be permitted to vote with Mr. Roos before an April 1994 meeting, then Chicago would not have issued the Policy. Since this Court cannot conclude as matter of law that IDC's failure to inform Chicago of this Unit owner's comment was *material*, Chicago is not entitled to summary judgment in connection with paragraph 3(b) of the Policy's exclusions.

### c.      Exclusion 3(d): Subsequent to the Policy

Under Policy exclusion 3(d), "[d]efects, liens, encumbrances, adverse claims or other matters . . . attaching or created subsequent to Date of Policy" are excluded from coverage. (ECF No. 48-13 at 11.)   It is undisputed that the Fifth and Sixth Amendments were recorded after the Policy was issued. (ECF No. 48-4 at 21, 27; ECF No. 48-13 at 14.)   Chicago argues that IDC's loss of the North Unit due to the Fifth and Sixth Amendments is not covered by the Policy because those amendments were passed and recoded after the Policy issued. (ECF No. 47 at 26-28.)  IDC characterizes this argument as a "red herring."  (ECF No. 51-5 at 27 n.11.)  IDC explains that there are several causes for its loss, including the voiding of the Third Amendment and the invalidation of the Master Declaration's title structure. *Id.* at 27-28.

In the Fifth Amendment, IDC extended through December 31, 2015 its development and special declarant rights in connection with the Reserved Area (North Unit). (ECF No. 48-4 at 11-22.)  In *ACA I*, the R.I. Supreme Court found that the Fifth Amendment was void due to the voting procedure used to pass it. *ACA I* at 130.  As such, the declarant's development rights in the Reserved Area "automatically expired when the declarant failed to exercise them on or before December 31, 1994." *Id.* at 131.

In the Sixth Amendment, IDC created a Master Unit in the Reserved Area. (ECF No. 48-4 at 22-27.)  In *ACA I*, the R.I. Supreme Court noted that even though plaintiff condominium associations had not challenged the Sixth Amendment, the R.I. Supreme Court determined that

the development rights in the Reserved Area "automatically expired" on December 31, 1994 because the declarant had failed to exercise them. *ACA I* at 131. In *ACA II*, the R.I. Supreme Court noted that IDC had "reserved development rights with respect to what was then called the Reserved Area" and "attempted to exercise these development rights . . . by executing and recording the [S]ixth [A]mendment." *Id.* at 441. The R.I. Supreme Court found that this amendment did not comply with the "substantial completion requirement of the [R.I. Condo] Act in effect in 1988, so "IDC []and its predecessors failed to create" the North Unit. *Id.* at 441-42.

If IDC lost the Reserved Area (North Unit) solely because of defects or other matters attaching or created after the Policy issues, then IDC's claim for that loss would be barred. Here, however, the cause of IDC's loss of the Reserved Area (North Unit) is not so clear and would have occurred absent the voiding of the Fifth and Sixth Amendments.[12] For example, in *ACA I*, the R.I. Supreme Court found that the Master Declaration's "voting scheme is inconsistent with" the R.I. Condo Act. *ACA I* at 130. Because IDC followed this voting procedure, the Third Amendment was declared void *ab initio* and IDC's attempt to extend its development rights in connection with the Reserved Area (North Unit) failed. *Id.* at 130. While the Fifth Amendment was passed after the Policy issued, it too failed due to its adherence to the Master Declaration's illegal voting protocol. Moreover, in *ACA I*, the R.I. Supreme Court did not analyze the validity of the Sixth Amendment[13] but IDC nevertheless lost its rights in the Reserved Area (North Unit). *Id.* at 131.

---

[12]  Chicago appears to recognize the complexity of the loss of the North Unit when it states (i) "[t]he Third Amendment . . . is the sole basis for IDC's claim against Chicago Title for a loss stemming from the North Unit," (ECF No. 47 at 23); and (ii) "any loss [of the North Unit] caused by the improper voting procedure that IDC employed in 'passing' the Third Amendment . . . is also excluded . . . ." (ECF No. 56 at 14.)

[13]  Plaintiffs had not challenged its propriety. *Id.* at 131.

The Rhode Island Supreme Court has tied the loss of the North Unit to the invalid voting procedure in the Master Declaration, as well as the void Third, Fifth, and Sixth Amendments. Due to these various ruling by the R.I. Supreme Court, the roots of IDC's claim for its loss of the North Unit are not easily delineated — while the Master Declaration and Third Amendment were recorded before the Policy issued, the Fifth and Sixth Amendments were not.   Viewing the record in the light most favorable to IDC, this Court cannot conclude that amendments passed post-Policy were the sole cause of IDC's loss in connection with the North Unit (Reserved Area). Therefore, Chicago is not entitled to summary judgment in connection with paragraph 3(d) of the Policy's exclusions.

### B.    North, South, And West Units

The parties do not dispute that the South Unit (Individual Unit) and West Unit (Development Unit #1) are covered by the Policy.  (ECF No. 48 at 3; ECF No. 53 at 3.)  This Court previously found that Chicago failed to show entitlement to summary judgment in connection with the North Unit due to coverage or exclusions.  Therefore, Chicago's arguments regarding IDC's failure to comply with the Policy are directed at the North, South, and West Units.

Chicago contends that IDC did not comply with the Policy's notice requirement, this failure caused "irreparable prejudice," and IDC failed to cooperate as required by the Policy. (ECF No. 47 at 28-39; ECF No. 56 at 19-31.)  IDC responds that due to Chicago's actual and timely notice of the *ACA* litigation, Chicago cannot argue that it was prejudiced.  (ECF No. 51-1 at 29-34.)  IDC further contends that Chicago has not made an affirmative showing of prejudice. *Id.* at 34-41.  Regarding cooperation, IDC disputes Chicago's allegation that it did not cooperate and further argues that the failure to cooperate is a question of fact.  *Id.* at 41-44.

1.      **Notice**

Chicago contends that IDC's failure to provide prompt written notice entitles it to summary judgment in connection with the North, South, and West Units. (ECF No. 47 at 28-35; ECF No. 56 at 19-28.)  IDC argues that Chicago had actual knowledge of the *ACA* litigation "almost two years" before it commenced and further "cannot demonstrate that it has been prejudiced at all." (ECF No. 51-1 at 29, 38.)

> The Policy required IDC to notify Chicago
>
> *promptly in writing* (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which [Chicago] may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable.

(ECF No. 48-13 at 12 (emphasis added)).  The Policy goes on to state that IDC's failure to notify Chicago will not prejudice IDC's rights unless Chicago is prejudiced, and, as discussed below, only to the extent of that prejudice.  *Id.*

It is undisputed that IDC first sent a Notice of Claim to Chicago on July 8, 2005.  (ECF No. 48 at 17; ECF No. 53 at 12; *see also* ECF No. 51-11 at 8-9.)  The July 8, 2005 letter states that "IDC's claim against the Policy arises as a result of that certain decision of the Rhode Island Supreme Court, dated April 8, 2005, which adversely impacted IDC's right, title, and/or interest in the real property described, and covered, by the Policy." (ECF No. 51-11 at 8.)

The R.I. Supreme Court has explained that clauses in insurance contracts requiring prompt notice do so "in order to facilitate the timely investigation of claims by bringing an event to the attention of the insurer allowing inquiry 'before the scent of factual investigation grows cold.'" *Avco Corp. v. Aetna Cas. & Sur. Co.*, 679 A.2d 323, 328 (R.I. 1996)(quoting *Textron, Inc. v. Liberty Mut. Ins. Co.*, 639 A.2d 1358, 1364 (R.I. 1994)).  Under Rhode Island law, an

insured is not "barred from recovering the benefits for which he or she has paid because of a breach of the policy's notice provision when there is no showing by the insurance carrier that it was prejudiced by the breach." *Pennsylvania Gen. Ins. Co. v. Becton*, 475 A.2d 1032, 1035 (R.I. 1984) (citing *Pickering v. American Emp'rs Ins. Co.*, 282 A.2d 584, 593 (R.I. 1971)). "The burden of showing prejudice is on the insurance carrier." *Id.* To ascertain whether an insurer has been prejudiced by a breach of the notice provision, courts "should look to the length of the delay, the reasons for the delay, and the probable prejudicial effect of the delay on the insurer." *Id.* (citing *A & W Artesian Well Co. v. Aetna Casualty & Sur. Co.*, 463 A.2d 1381, 1383 (R.I. 1983)).[14]

Regarding the length of delay, Chicago points to the amount of time elapsed between several relevant happenings and the July 8, 2005 date notice was provided. (ECF No. 47 at 32.) For example, notice was provided six years after the 1999 filing of the *ACA* litigation in Superior Court; four years after the 2001 entry of summary judgment in Superior Court; fifteen months after the R.I. Supreme Court's March 2004 *ACA I* opinion; and three months after the R.I. Supreme Court's April 2005 *ACA II* opinion. *Id.* Although IDC's notice to Chicago was not prompt, "the mere passage of time is not sufficient to establish prejudice." *Pennsylvania General*, 475 A.2d at 1036.

Regarding reasons for the delay, IDC does not offer a specific reason for failing to provide prompt notice in writing. Instead, IDC contends that Chicago had actual and timely notice of the litigation. (ECF No. 51-1 at 29.) For example, IDC points to a December 15, 1997 memo from Chicago's counsel to IDC's counsel informing IDC that Chicago will not "insure sub-condominium units within North Development Unit." (ECF No. 51-7 at 31.) In that memo,

---

[14]   While the parties cite numerous cases on the issues of notice and prejudice, none is controlling.

Chicago's counsel notes disagreement with the "assertion that the law is clear that Master Unit Owners are the proper parties to vote" and indicates his awareness of "threatened litigation over the operation and management of the master condominium by the sub-condominium unit owners." *Id.* The memo also expresses Chicago's opinion that "as of December 31, 1994, the development rights for the creation of any units within Goat Island Condominium expired."[15] *Id.* IDC also points to a December 6, 2000 memo from its counsel to Chicago's counsel where IDC's counsel states that the *ACA* litigation "is directed . . . against the right of the Declarant to utilize the 'Undeveloped Master Units'" and explains that "[a]ll of the counts of the complaint are directed toward the exercise of development rights by the Declarant."[16]  (ECF No. 51-8 at 7-8.)

Focusing on prejudice, Chicago contends:  it lost the chance to investigate the claim when facts were fresh in people's minds; it was deprived of the opportunity to cure the title defect or defend or settle the claims; it did not have the opportunity to mitigate or reduce the claimed loss; and its subrogation rights were impaired.  (ECF No. 47 at 35-38; ECF No. 56 at 28-30.)  IDC counters that Chicago cannot demonstrate any prejudice as it was aware of the litigation but did not intervene, and the plaintiff condominium associations would not have settled.  (ECF No. 51-1 at 38.)  Although Chicago has made several arguments regarding prejudice, it has provided neither undisputed evidence of prejudice nor undisputed evidence of

---

[15]  While Chicago responds that this memo shows that it understood the dispute to be between IDC and the sub-condominiums, the memo directly addresses the issue of the proper parties to vote as well as the expiration of development rights, two critical issues in the *ACA* litigation. (ECF No. 56 at 25-26.)

[16]  Chicago responds that this memo is not "Notice" because it pertains to the post-Policy exercise of development rights.  (ECF No. 56 at 26.)  IDC exercised its development rights pursuant to the procedure set forth in the Master Declaration, a "voting scheme" invalidated by the R.I. Supreme Court. *See ACA I* at 130.

what it "would have done even if [IDC's] claim had been filed much earlier." *Cooley v. John M. Anderson Co.*, 443 A.2d 435, 437 (R.I. 1982).

Here, at summary judgment, this Court must draw all reasonable inferences in favor of IDC. For IDC's failure to provide prompt written notice to absolve Chicago of liability, Chicago first must carry its burden to show it was prejudiced by the breach. While written notice was not prompt, undisputed evidence indicates that Chicago was aware of the litigation giving rise to IDC's claims before IDC provided formal written notice. However, the record before this Court does not indicate precisely when Chicago was aware. Nor does the record contain evidence regarding what Chicago did when it became aware that a claim might exist, i.e., whether Chicago undertook an investigation, considered participating in pre-litigation discussions, or evaluated intervening in the litigation. In addition, Chicago has not set forth undisputed facts regarding the harmfulness of the opportunities it asserts it lost due to the late written notice.[17] Given the record at this time, a genuine issue of material fact exists regarding whether Chicago was prejudiced by IDC's failure to provide prompt written notice.

### 2. Extent of the Prejudice

This Court has determined that Chicago has not met its burden to show it was prejudiced by late written notice. Even if Chicago had shown prejudice as matter of law, it would not entitle Chicago to summary judgment because the Policy specifies that when notice is late, the insured's rights are only prejudiced "to the extent of the prejudice" to Chicago. (ECF No. 48-13 at 12.) The Policy states:

> If prompt notice shall not be given to [Chicago], then as to [IDC] all liability of [Chicago] shall terminate with regard to the matter or matters for which prompt

---

[17] Although based on Maine law, this Court finds persuasive the First Circuit's analysis of prejudice in connection with late notice in *Maine Drilling & Blasting, Inc. v. Ins. Co. of N. America*, 34 F.3d 1, 5 (1st Cir. 1994).

notice is required; provided, however, that failure to notify [Chicago] shall in no case prejudice the rights of any insured under this policy unless [Chicago] shall be prejudiced by the failure and then only to the *extent of the prejudice.*

*Id.* (emphasis added).  If Chicago shows it is prejudiced, then it must establish the extent of that prejudice.

### 3.     Cooperation

After IDC provided its notice of claim, Chicago contends that IDC failed "to fully cooperate" with Chicago's investigation because it did not complete an EUO in a timely fashion. (ECF No. 47 at 39.)  IDC responds that it cooperated, it is only obligated to cooperate when Chicago has taken action to defend title, and the determination regarding whether it cooperated is an issue of fact.  (ECF No. 51-1 at 41-43.)

In the Policy's Conditions and Stipulations, section 5 provides that IDC "may reasonably be required to submit to [an EUO]."  (ECF No. 48-13 at 12.)  IDC designated Mr. Roos for an EUO; it began on November 14, 2006 and it stopped after less than five hours.  (ECF No. 48 at 18; ECF No. 53 at 12.)   Several attempts to schedule the continuation of the EUO proved unsuccessful.  (ECF No. 48 at 18-19; ECF No. 53 at 12-13.)

In *Ogunsuada v. Gen. Accident Ins. Co.*, 695 A.2d 996, 1000 (R.I. 1997), the R.I. Supreme court stated "that when a question of cooperation is raised it usually has to be determined as a question of fact."  (Internal quotation marks and citation omitted.)  "[T]he factual question of cooperation should not ordinarily be decided on a summary judgment motion."  *Id.*  Here, Chicago bears the burden on the issue of noncooperation.  *Id.* at 999.  "Any alleged breach of a cooperation clause . . . has to be substantial as well as material in order to relieve the insurer of its liability under the policy, and a mere technical or inconsequential lack of cooperation would be insufficient to void the policy and the liability of the insurer."  *Id.*

In *Ogunsuada*, there was "no evidence in that record . . . that could even remotely suggest to the motion justice that [the insured], despite diligent effort by [the insurance company] for him to do so, had ever made any attempt to cooperate with [the insurance company] in the defense of the [] action." *Id.* at 1000.  On that record, summary judgment for the insurance company was affirmed. *Id.* at 997, 1001.

Here, there is undisputed evidence that IDC through Mr. Roos cooperated and was examined under oath.  There is undisputed evidence that IDC participated in attempts to complete the EUO.  Further, Chicago has not provided evidence that the EUO delays were "substantial" and "material."  Chicago therefore has failed to meet its burden and is not entitled to summary judgment in connection with the EUO.

### C.    West Unit

Chicago's final argument is that IDC's loss of the West Unit is not covered by the Policy because it was caused by IDC's post-Policy failure "to timely and properly exercise its development rights in the West Unit." (ECF No. 47 at 40.)  IDC contends that "latent defects" in "the insured documents" led to its loss of the West Unit.  (ECF No. 51-1 at 44.)

It is undisputed that the West Unit (Development Unit #1) is covered by the Policy. (ECF No. 48 at 3; ECF No. 53 at 3; ECF No. 48-13 at 14.)  The Master Declaration, recorded before the Policy issued, includes Special Declarant and Development rights in connection with Development Unit #1 (West Unit).  (ECF No. 48-3 at 17-19; ECF No. 51-5 at 87.)  Section 6.2(a) specifies that the "Declarant hereby reserves the right, through December 31, 1994, to construct improvements on Development Unit #1 and submit Development Unit #1 to a declaration of condominium," creating a Sub-Condominium "containing not more than 8 units." *Id.* at 17.  After the Policy issued, GIS passed and recorded the Fourth Amendment, extending

the Declarant's rights in Development Unit #1 through December 31, 1999. (ECF No. 48-4 at 7-
10.) The Fourth Amendment was passed "by a vote in excess of sixty-seven percent (67%) in
voting interest of all Owners and Sub-Association Board Members, cast in accordance with the
provisions of the Master Bylaws . . . ." *Id.* at 8. The Fifth Amendment, recorded shortly after
the Fourth, extended these rights through December 31, 2015. *Id.* at 11 -21.

In *ACA I*, the R.I. Supreme Court found that the "Fourth and Fifth Amendments were
void *ab initio*" due to "the voting procedure employed at the special meetings." *ACA I* at 130.
The R.I. Supreme Court found that the declarant's development rights in the West Unit expired
after December 31, 1994. *Id.*

In *ACA II*, the R.I. Supreme Court noted that the Master Declaration, recorded in 1988,
characterized Development Unit #1 (the West Unit) a "Master Unit." *Id.* at 436, 439. However,
the R.I. Supreme Court found that in 1988 "no structural components were located on [the West
Unit] that met the requirements for 'substantial completion' that the [R.I. Condo] Act cites as a
prerequisite for recording a declaration of condominium." *Id.* at 440. Accordingly, since "the
declarant failed to meet the conditions necessary to create [a] unit[] in the master declaration,"
the West unit was never "validly created." *Id.* The R.I. Supreme Court concluded that the West
Unit was, and remained, a common element. *Id.*

According to the R.I. Supreme Court, therefore, IDC lost its rights in the West Unit in
multiple ways: (i) in 1988, there was not substantial completion on the West Unit as required for
it to be a Master Unit; and (ii) IDC's attempt to extend its development rights, pursuant to the
procedures set forth in the Master Declaration, violated the R.I. Condo Act. While Chicago
focuses here on the failed attempt to extend development rights, Chicago recognizes that "IDC
lost its claimed rights to the West [] Unit[] because IDC had not performed any construction,

34

much less the requisite 'substantial completion,' at the time that [it was] declared to be [a] "master unit[]."  (ECF No. 47 at 28.)

At this juncture, viewing the record in the light most favorable to IDC, this Court cannot say that IDC's loss of the West Unit (Development Unit #1) was caused exclusively by IDC's post-Policy actions.  The R.I. Supreme Court's opinions tied that loss to both the topography of the West Unit in 1988 and the impermissible voting procedures in the Master Declaration, procedures followed by IDC.   Summary judgment therefore cannot enter for Chicago in connection with the West Unit.

## IV.    CONCLUSION

Viewing the evidence in the light most favorable to IDC, Chicago has failed to establish that there are no genuine issues of material fact and that it is entitled to judgment as matter of law.  Chicago's Motion for Summary Judgment (ECF No. 46) therefore is DENIED.


IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 30, 2013