UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| IDC PROPERTIES, INC., <br>     Plaintiff, <br><br> v. <br><br> CHICAGO TITLE INSURANCE COMPANY, <br>     Defendant. | C.A. No. 09-632-JJM-PAS |

MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Chief Judge.

Defendant Chicago Title Insurance Company ("Chicago Title") issued a title insurance policy ("Policy") to Plaintiff IDC Properties, Inc. ("IDC Properties") in connection with IDC Properties' acquisition of rights, title, and interests in Goat Island South, a waterfront condominium development in Newport, Rhode Island. This real estate has spawned many cases and controversies. Here, IDC Properties seeks the $10 million Policy limit because of the alleged loss of its rights, title, and interests in the North, West, and South Unit parcels in Goat Island South resulting from Rhode Island Supreme Court rulings. Chicago Title denied coverage, and IDC Properties sued. Chicago Title sought summary judgment after discovery closed, which the Court denied. ECF No. 65. Seven years later (to the day), Chicago Title again seeks summary judgment. ECF No. 134. IDC Properties objects (ECF No. 137) and Chicago Title replies. ECF No. 139.

In summary, the Court finds that Chicago Title did not breach its contract over the North Unit because IDC Properties never lost its interest to exercise its

development rights. IDC simply did not timely exercise its right consistent with the law. As for the South and West Units, material issues of fact exist so summary judgment should not enter as to the claims for losses related to those two units.

## I. FACTS

The facts involved in this half-century old property saga about an island[1] in the City-by-the-Sea have been well covered in the annals of American jurisprudence.[2] To put this opinion in context for the reader, the Court will recite a few of the relevant facts here.

After buying Goat Island in 1968 from the Redevelopment Agency of Newport, Rhode Island for $168,000, Globe Manufacturing Co. ("Globe") separated the property into three lots and built a hotel (Lot #1), a marina (Lot #2), and residences (Lot #3) (comprising two apartment complexes, America and Capella), and 19 free-standing homes (Harbor Houses). Lot #3, along with the three

---

[1] Specifically, this case involves Goat Island in Newport, Rhode Island. "Narragansett Indians called the island 'Nante Sinunk' and sold it in 1658. Early Newport colonists used the island as a goat pasture." https://en.wikipedia.org/wiki/Goat_Island_(Rhode_Island)(last visited May 21, 2021). This island transformed over the years from a pirate burial cemetery to Fort George, to a British Army fort and location of the "first shots in resistance to British authority in America in 1764," to the Navy Torpedo Factory which for 100 years produced many of the Navy's torpedoes for World War I and World War II, to its redevelopment in the late 1960's as a hotel, residential, and commercial center. *Id.*

[2] *See, e.g.*, *Am. Condo. Ass'n, Inc., v. IDC, Inc.*, 844 A.2d 117 (R.I. 2004) (*America I*); *Am. Condo. Ass'n, Inc., v. IDC, Inc.*, 870 A.2d 434 (R.I. 2005) (*America II*); *In re IDC Clambakes, Inc.*, 484 B.R. 540 (D.R.I. 2012), *aff'd*, 727 F.3d 58 (1st Cir. 2013), *aff'd, In re IDC Clambakes, Inc.*, 852 F.3d 50 (1st Cir. 2017); *IDC Properties, Inc. v. Goat Island South Condo. Ass'n, Inc.*, 128 A.3d 383 (R.I. 2015); *IDC Clambakes, Inc. v. Carney as Tr. of Goat Island Realty Tr.*, 246 A.3d 927 (R.I. 2021); *Commonwealth Land Title Ins. Co. v. IDC Properties, Inc.*, 524 F. Supp. 2d 155 (D.R.I. 2007), *aff'd*, 547 F.3d 15 (1st Cir. 2008).

residential complexes (America, Capella, and Harbor), also had a commercial area, and "three largely unimproved areas." Lot #3 was the largest lot comprising 23.3 acres.

In the mid to late 1980's, Globe decided it wanted to sell off some of Lot #3, and to preserve the vacant areas for future development or sale. Because of the City of Newport's frontage requirements,[3] all of Lot #3 needed to remain a single lot so Globe turned Lot #3 into the "Goat Island South – A Waterfront Condominium" ("GIS Condominium") under the Rhode Island Condominium Act, R.I. Gen. Laws § 34-36.1 ("the Act"). The Declaration of Condominium established the Master Unit and divided Lot #3 into six defined sub-condominium units of the GIS Condominium (the three residential areas, and the three undeveloped areas). "[T]he declarant purported to create five "Master Units" in the condominium. These are the "America Condominium" Unit, the "Capella Unit," "Development Unit # 1" ("West Unit"), the "Harbor Houses Condominium" Unit, and the "Individual Unit" ("South Unit")." *America II*, 870 A.2d at 439.

Three months later the original condominium declaration was amended to reserve certain development rights, "including the right to convert the Reserved Area [North Unit] to a master unit and to construct improvements on it or to withdraw it completely from the GIS Condominium." *IDC Clambakes, Inc.*, 246

---

[3] All three lots abutted the single road onto Goat Island. If Lot #3 were subdivided, the new subdivisions would not abut a public road, violating Newport law requiring each parcel to have frontage on a public road.

3

A.3d at 930.[4] It provided that the development rights would expire on December 31, 1994. *Id.* The declaration also

> provided for "SPECIAL DECLARANT AND DEVELOPMENT RIGHTS." Specifically, it reserved to the declarant through December 31, 1994, *** the right "to withdraw the [North Unit] from the Goat Island South Condominium," the right to convert the North Unit to a master unit, and, if so converted to a master unit, "the right, through December 31, 1994, to construct improvements on the [North Unit] and submit the [North Unit] to a Declaration of Condominium, thereby creating a condominium containing not more than 315 units."

*America II*, 870 A.2d at 436.

By the early 1990's, Globe had decided to divest itself of its interest in Goat Island, so it created Island Development Corporation, and transferred all of its interest in Goat Island to the new corporation. By 1994, Island Development Corporation "had not yet exercised its development rights set forth in the master declaration." *America I*, 844 A.2d at 122; *America II*, 870 A.2d at 441. Because of the looming deadline, Island Development Corporation tried to extend its development rights by passing the Third Amendment on April 27, 1994, which purported to extend the development rights to the Reserved Area for another five years until December 31, 1999.

In August 1994, Thomas Roos, the grandson of an original Globe founder, bought Island Development Corporation, which included the hotel, marina, and the GIS Condominium. Island Development Corporation transferred the hotel to IDC Hotel, Inc, the marina to IDC Marina, Inc., and the GIS Condominium to Plaintiff

---

[4] Because at the time the Act did not allow land-only (unimproved) condominium units, Globe filed an amendment to the original declaration ("FAR Declaration") defining each unit as airspace only.

4

IDC Properties. Two days after purchasing Goat Island, IDC Properties bought a $10 million title insurance Policy from Chicago Title that is the subject of this litigation.[5] The Policy insured all of IDC Properties' right, title, and interest in the property listed in Schedule A.

Concern was raised soon after Mr. Roos' purchase about the way GIS Condominium adopted the Third Amendment that sought to extend the development rights for five years until December 31, 1999. ECF No. 135 ¶ 21 ("[M]y lawyers clearly were dissatisfied with the Third Amendment.") So, GIS Condominium purported to adopt a Fifth and Sixth Amendment[6] at the end of 1994 in an attempt to remedy the perceived flaws in the Third and Fourth Amendments. The Fifth Amendment sought again to extend the development rights over the Reserved Area. The Sixth Amendment purported to exercise IDC Properties' right to convert the Reserved Area into the North Unit. "That amendment would convert the Reserved Area into a master limited common element whose above airspace would constitute a Master Unit with associated development rights. The converted area would be known as the North Development Unit." *America I*, 844 A.2d at 125. Both the Fifth and Sixth Amendments were adopted after Chicago Title issued the title insurance.

With the propriety of the Amendments unclear, IDC Properties built a multi-million-dollar wedding and banquet facility (the Newport Regatta Club) on the North Unit. *America I*, 844 A.2d at 135.

---

[5] Chicago Title had twice before insured the GIS Condominium.

[6] The Fourth Amendment involved the South Unit. *America I*, 844 A.2d at 123.

Litigation ensued in state court between sub-condominium unit owners (America, Capella, and Harbor) and IDC Properties. The sub-condominium unit owners "maintained that the defendants had improperly extended their development rights on certain areas of common property within the condominium complex and that because these development rights actually had expired, title to the common property now vested in the plaintiffs in fee simple." *Id. at* 119. The Rhode Island Supreme Court held that the voting structure of the FAR Declaration did not follow the Act, and therefore, the Third, Fourth, and Fifth Amendments were void ab initio. It determined that IDC Properties' "development rights" had run on December 31, 1994 and that IDC Properties' failure to exercise its "development rights" by the 1994 deadline converted the North, South, and West Master Units into Master common elements, thereby stripping IDC Properties of its title ownership to those Master Units and, as a result, the highly lucrative Newport Regatta Club at the North Unit. *Id.* at 132-33. Deciding that the land was common property, the Rhode Island Supreme Court concluded that "when the associated development rights expired, so also did all of the declarant's rights in the master units. Accordingly, the hearing justice should have declared that title to the disputed property vested in the individual unit owners in fee simple." *Id.* at 133.

> The court later clarified its opinion, holding that:
>
> In the master declaration, the declarant did not attempt to create a unit on the parcel now referred to as the North Unit. Instead, it reserved development rights with respect to what then was called the Reserved Area. IDC Properties attempted to exercise these development rights on December 29, 1994, two days before they

6

> expired, by executing and recording the sixth amendment to the declaration of condominium. In this amendment, IDC Properties attempted to create a unit in the airspace above the land described as the North Unit, while the land itself became a master limited common element. The amendment, however, complied with neither the substantial completion requirement of the Act in effect in 1988 nor the 1991 amendment providing for land-only units. Thus, IDC Properties again failed to establish a valid unit in the North Unit. Its development rights since have expired and, without a valid unit, it cannot exercise any rights to make improvements or alterations.

*America II*, 870 A.2d at 441–42. The Rhode Island Supreme Court concluded by defining the status of the property in 2005.

> We conclude, therefore, that those portions of airspace in the South, West, and North parcels that defendants and their predecessors intended to be master units are common elements because no units were created therein. The land underlying these "units" likewise is part of the common elements. Because no units were validly created, no master limited common elements appurtenant to them could be created. Consequently, these portions of the condominium always were, and remain, common elements.
>
> *****
>
> These master units, so-called, always were common elements, subject to the exercise of said development rights, and title rested with the unit owners in common ownership from the creation of the condominium.

*Id.* at 442-43. Because the Rhode Island Supreme Court declared the Master Units and Reserved Area as common elements and expired development rights, IDC Properties lost its development right interests and sought compensation from its title insurance company.

When Chicago Title denied coverage, IDC Properties filed this lawsuit in 2009. ECF No. 1-1. The parties undertook extensive discovery. Chicago Title moved for Summary Judgment. ECF No. 46. The Court denied the motion in 2012. ECF No. 65. The parties filed substantive Motions in Limine that the Court

7

decided. *See* ECF No. 105, Oct. 27-29, 2014 Text Orders. The parties filed other Motions for Summary Judgment (ECF Nos. 113, 114) that the Court denied. *See* Nov. 19, 2015 Text Order. In September 2020, Chicago Title filed this third Motion for Summary Judgment (ECF No. 134), that the Court now resolves.

## II. ARGUMENT

This motion turns on resolution of a few issues: the state of IDC Properties' ownership interest when Chicago Title issued the Policy, what the Policy covered, and finally whether IDC Properties was damaged by its insured interest being vested in another. The Court will first analyze title insurance coverage for the North Unit because it is the largest, and then turn to the South and West Units.

### A. NORTH UNIT / RESERVED AREA

#### 1. *Ownership*

When the Policy was issued on October 21, 1994, the FAR Declaration and the Third Amendment defined IDC Properties' interests. No other Amendments were in effect before Chicago Title issued the Policy.

The FAR Declaration established a condominium consisting of six defined parcels, five of which were Master Units. One parcel – the "Reserved Area" – was not a Master Unit. The FAR Declaration also established "Special Declarant and Development Rights." As to the Reserved Area, it granted IDC Properties through December 31, 1994:

- the right "to withdraw the [Reserved Area] from the Goat Island South Condominium,"

- the right "to convert the [Reserved Area] to a Master Unit,"
- "and, if so converted to a Master Unit, the right … to construct improvements on the [Reserved Area] and submit the [Reserved Area] to a Declaration of Condominium, thereby creating a condominium containing not more than 315 units."

*America II*, 870 A.2d at 436.

At a meeting of the condominium association on April 27, 1994, it passed the Third Amendment. The Third Amendment purported to extend until December 31, 1999, the special declarant rights to withdraw the unit, to convert the Reserved Area to a Master Unit, and if so to construct residences. *America I*, 844 A.2d at 122–23.

### 1. Policy

"The Policy insures against loss or damage sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land."

ECF No. 135-6 at 2.

Schedule A (5.1) states: "All right, title, and interest in the following Condominiums: (a) the individual unit, developmental unit #1, and development and special declarant rights in and to Goat Island South – A Waterfront Condominium, as created by the Declaration of Condominium dated as of January

12, 1988 recorded with the Land Evidence Records of the City of Newport in Book 115 at Page 138. . ."

*Id.* at 6.

### 2. *Analysis of the Claim*

In its first Motion for Summary Judgment decision, this Court found that the "development and special declarant rights" covered by the Policy included those for the Reserved Area even though the Reserved Area was not a Master Unit when Chicago Title issued the Policy. IDC Properties urges the Court to stop its analysis there, claiming that Chicago Title seeks a do-over, or reconsideration of this Court's decision even though there is no basis to support reconsideration. The Court disagrees with IDC Properties.

The question before the Court now on the North Unit is not whether the Policy covered IDC Properties' development rights (the Court is not reconsidering its prior ruling). The Policy covers IDC Properties Special Declarant and Development Rights for the Reserved Area. The question now before the Court is whether IDC Properties' development rights for the Reserved Area as defined in the FAR Declaration when the Policy was issued were ever damaged, injured, or lost.

A review of the record before the Court establishes that there is no material factual dispute about what IDC Properties owned when Chicago Title issued the Policy and what it lost that the Policy covered.

10

- IDC Properties owned the right to withdraw the Reserved Area from the condominium. While it never lost that right, IDC Properties never exercised that right and never withdrew the Reserved Area. As Chicago Title states in its papers, "Why IDC failed to avail itself of this obvious solution to its predicament is an unsolved mystery . . ." ECF No. 134-1 at 12.

- IDC Properties owned declarant and development rights to convert the Reserved Area into a Master Unit by December 31, 1994. IDC Properties never lost the right to convert the Reserved Area into a Master Unit. In fact, it was able to convert the Reserved Area into a Master Unit by filing the Sixth Amendment.[7]

The evidence is unrefuted, and the Rhode Island state court decisions have so held, that IDC Properties lost ownership of the North Unit not because of a title defect in its declarant and development rights, but because it had built no buildings on the North Unit when it filed the Sixth Amendment. This attempted conversion was illegal because to establish a Master Unit, the Act requires substantial completion or at a minimum some detailed planning. IDC Properties' attempt to create a unit without complying with the Act was not an insured loss under the Policy because its title to the Special Declarant and Development Rights was not affected. That IDC Properties did not properly exercise its unchallenged right to convert the Reserved Area into a Master Unit does not mean that IDC

---

[7] No one questioned IDC Properties' unilateral right to record the Sixth Amendment exercising its development right to convert the Reserved Area. *See America I*, 844 A.2d at 125 n.12 ("The plaintiffs do not challenge the validity of the Sixth Amendment to the Master Declaration, conceding that the master declaration granted the declarant the right to make such a conversion on or before December 31, 1994.").

Properties' title to that right was defective.  IDC Properties "attempted to exercise these development rights…by executing and recording the [S]ixth [A]mendment;" however, the amendment did not comply with the substantial completion requirement of the Act, so IDC and its predecessors failed to create the North Unit. *America II*, 870 A.2d at 440-42.  IDC Properties never lost the right to timely convert;[8] it just did not exercise its right correctly – and there is no insurance against that.[9]

Because IDC Properties did not lose any title to the estate or interest in the property it owned when the Policy was issued, there is no evidence that Chicago Title breached the contract with IDC Properties by failing to pay compensation under the Policy for the loss of development rights in the Reserved Area.  The Court therefore GRANTS Chicago Title's Motion for Summary Judgment as to the North Unit.

---

[8] An analogy that might help explain the Court's reasoning – imagine that a person owned an option to buy a piece of land and that right to the option was insured. And further imagine that when the option owner went to exercise the option, it was not able to obtain financing, and therefore unable to purchase the land. When the option owner complained to her insurance company that she lost the option, the insurance company denied the claim because the option owner did not lose the option, it simply did not effectuate the option properly.  Similarly, here, IDC Properties did not lose its development rights, it simply did not effectuate that right appropriately – i.e., it exercised its development rights by converting the reserved Area into a Master Unit when it has not substantially completed construction on it.  Title insurance only insured that the right existed, it did not guarantee that IDC Properties would effectuate that right appropriately.

[9] Even if the failure to effectively convert the Reserved Area into a Master Unit was a title defect, Chicago Title correctly argues in the alternative, that there is no coverage because the loss was caused by a defect IDC Properties, the insured, created and therefore Policy exclusion 3(a) applies.  The First Circuit acknowledged the applicability of this exclusion in a case involving another title insurance company. *Am. Title Ins. Co. v. East West Fin.*, 16 F.3d 449, 455 (1st Cir. 1994).

### A. SOUTH and WEST UNITS

Chicago Title admits that it insured title to both the South Unit and the West Unit and further admits that IDC Properties incurred a title defect as to those two Master Units. It now claims, however, that IDC Properties has suffered no damages as a matter of law from the title defect. IDC Properties responds by asserting that it suffered significant losses when it lost title to these two Master Units.

As to the South Unit, Chicago Title's contention stems from its assertion that the FAR Declaration did not reserve development rights to the South Unit, *see America II*, 870 A.2d at 436, and therefore would need to use the R.I. Condominium Act to build on the unit, which would have required the almost-impossible feat of obtaining unanimous consent from the 154 individual unit owners. As to the West Unit, while the FAR Declaration did reserve some development rights, Chicago Title claims that IDC Properties did not timely act on its development rights, rendering the unit valueless.

IDC Properties counters that the right to construct buildings and improvement on both the South and West Units was "inherent in and coterminous with its title in and to those Master Units." ECF No. 137 at 30. It asserts that its right to improve the units was not limited by any deadline. It claims that when it lost title to the South and West Units, IDC Properties also lost its right to construct improvements on those pieces of property – more specifically residential properties. Its experts place the value of the loss at $540,000 for the South Unit and $560,000 for the West Unit as of December 1997.

IDC Properties always had, and never lost, its right to improve these two units. The improvement rights were separate and distinct from the development rights in the FAR Declaration and were not bound by the time limits in the declaration.[10] The right to build a single-family residence on these two properties was part of the improvement rights in its title. So, when it lost title to the South and West Units, IDC Properties also lost its right to construct improvements on those pieces of property – more specifically, residential properties. A residence on waterfront property located on a private island in Newport has value and the loss of that right results in damages that could be compensable in a breach of contract claim.[11]

Because there are disputed issues of material fact underlying IDC Properties' claims relating to the South and West Units, the Court DENIES Chicago Title's Motion for Summary Judgment as to the South and West Units.

## I. CONCLUSION

---

[10] The Rhode Island Supreme Court began its decision by discussing the differences between "development rights" and "improvement rights" under the Act. *America II*, 870 A.2d at 437-38. "Development rights," the Court explained, were specific statutory rights created by the Act and related solely to a declarant's right to add or remove real estate to or from a condominium. *Id.* at 438. The Act required these rights to be bounded by a specific time limit on their exercise. *Id.* "Improvement rights," on the other hand, related to a condominium unit owner's inherent right to improve their unit. *Id.* The Act did not require these rights to be bound by any specific time limit on their exercise. *Id.*

[11] IDC Properties also points out that its loss of title was not limited to the Master Unit; it also lost the approximately twenty percent ownership interests in the Master Common Elements of the GIS Condominium, appurtenant to the South and West Units.

Viewing the evidence in the light most favorable to IDC Properties, Chicago Title has established that there are no genuine issues of material fact and that it is entitled to judgment as matter of law as to coverage for the North Unit; but has not established that as to coverage for the South and West Units. Summary judgment is thus appropriate as to coverage for the North Unit but not appropriate as to coverage for the South and West Units. Therefore, the Court GRANTS IN PART AND DENIES IN PART Defendant Chicago Title Insurance Company's Motion for Summary Judgment. ECF No. 134.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Chief Judge

May 21, 2021