UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IDC PROPERTIES, INC.,<br>        Plaintiff,<br><br>    v.<br><br>CHICAGO TITLE INSURANCE<br>COMPANY,<br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 09-632-JJM-PAS<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

JOHN J. McCONNELL, JR., United States District Chief Judge.

Beautiful Goat Island in Newport, Rhode Island is at the center of this decades-long litigation[1] where both state and federal courts have weighed in on various disputes. The Court held a bench trial, including expert testimony and a viewing of the West and South Units on Goat Island along with comparable properties in Newport, to assist the Court with calculating damages. Plaintiff IDC Properties, Inc. and Defendant Chicago Title Insurance Company filed post-trial briefs. As stubborn as its namesake location, this case has reached its final disposition.

## I.    FINDINGS OF FACT

The Court makes the following findings of fact:

1.    Globe Manufacturing Co. ("Globe") recorded the formative documents and was the original declarant of the master condominium known as the

---

[1] Chicago Title likens the course of this litigation to the plot of Charles Dickens' classic, <u>Bleak House</u>, the tale of a never-ending lawsuit over an estate that had "become so complicated that no man alive knows what it means." That case did end, however, because ironically the litigation costs consumed the estate itself.

Goat Island South Condominium ("GIS Condominium") located on Goat Island in Newport, Rhode Island. *IDC Props., Inc. v. Chicago Title Ins. Co.*, 42 F.4th 1, 2 (1st Cir. 2022) ("*IDC First Circuit*").

2.    Globe recorded the GIS Condominium's First Amended and Restated Declaration of Condominium on March 3, 1988 ("FAR Declaration"). *Id.* at 2.

3.    It was not until October 19, 1994, that IDC became the successor declarant of the GIS Condominium. *Id.* at 4.

4.    The FAR Declaration described the GIS Condominium as consisting of five existing "Master Units," with the right to create a sixth over a portion of land identified as the "Reserved Area." *Id.* at 2. Three of the five Master Units had existing residential buildings within them, which were each subjected to independent condominium declarations ("Sub-Condominium Master Units") creating Sub-Condominiums therein. *Id.*

5.    Under the FAR Declaration, each Master Unit was made up of the airspace above and all buildings and improvements then or thereafter located on the land, while the land underlying each Master Unit was designated as a Master Limited Common Element reserved for the exclusive use of the owners of the Master Unit located above. Ex. 4. "Master Units" are defined under the FAR Declaration as "a physical portion of the [GIS Condominium] designated for separate ownership or occupancy or designated as a Sub-Condominium." *Id.*

6.      At the time it became the successor declarant to the GIS Condominium, IDC acquired, among other things, fee simple title to two existing Master Units known as Development Unit No. 1 ("West Unit") and the Individual Unit ("South Unit"). Ex. 63 at 16-17.

7.      The West Unit is an approximately 36,397 square foot unimproved oceanfront parcel. *Id.* at 16. It has no paved access road and an electrical easement.

8.      The South Unit is an approximately 38,388 square foot unimproved oceanfront parcel. *Id.* at 17. A Coast Guard foghorn, an electric utility easement, and a paved turnaround for the Goat Island access road were located on the parcel. Ex. N. Under the FAR Declaration, the turnaround was a permanent easement for the individual unit owners of the other residential buildings. Ex. 4.

9.      IDC also acquired a number of unsold units in each of the three Sub-Condominium Master Units, becoming the owner of a majority of the units in each of the three Sub-Condominiums.

10.     In accordance with the voting provisions and procedures of the FAR Declaration, as the majority owner of each Sub-Condominium, IDC had the right to control how the singular vote of each of the three Sub-Condominium Master Units was cast. Ex. 1.

11.     According to the voting provisions of the FAR Declaration, IDC's majority ownership of the Sub-Condominium Master Units, along with

its outright ownership of the South and West Units, provided it with the ability to obtain unanimous consent of the five existing Master Units for the purposes of adopting amendments to the condominium documents. *Id.*

12.   Lastly, IDC also acquired all development and special declarant rights (collectively, "Development Rights") in and to the GIS Condominium as stated in the FAR Declaration.  Ex. 4.

13.   The FAR Declaration reserved to IDC the right, as the owner of the South Unit and the West Unit, to construct buildings therein in perpetuity.  *Id.*

**IDC's Policy**

14.   Chicago Title issued title insurance owner's policy CTIC No. 946190133 to IDC in the amount of ten million dollars ("Policy") on October 21, 1994.  Ex. 10.

15.   The Policy insured in fee simple all of IDC's "rights, title, and interest" in the South Unit, the West Unit, the Development Rights, and the Sub-Condominium units, as created by the declaration of the GIS Condominium, as amended to the date of the Policy.  *Id.*

16.   The Policy contained typical insurance coverage provisions requiring that an insured shall notify the insurer "promptly in writing" of any litigation, any claim adverse to the insured title or interest, or if the title

becomes unmarketable, Condition 3; and for apportionment of losses if the title insured is for a multi-parcel land., Condition 8. *Id.*

**Chicago Title's Knowledge of the Unit Owner's Adverse Claim**

17. As early as the closing at which the Policy was issued in 1994, Chicago Title was aware there was a problem with the extension of the Development Rights. Trial Tr. 42:12-21, May 26, 2023.

18. However, Jeffrey Meyer, Esq., the state manager of Rhode Island for Chicago Title, did not recognize that Chicago Title had insured IDC's Development Rights as extended by the Third Amendment. Trial Tr. 42:22-43:12, May 26, 2023.

19. In 1997, IDC began planning for construction on the North Unit and sought additional title insurance to cover its multi-million-dollar investment. In 1997, IDC also sought to buy additional coverage from Chicago Title. *IDC First Circuit*, 42 F.4th at 4.

20. Citing its awareness of threatened litigation, Chicago Title refused to issue additional title insurance coverage for the North Unit. Ex. 29. Chicago Title did not acknowledge that the threat of litigation had any bearing on interests insured under the Policy because Mr. Meyer did not believe that Chicago Title had insured the Development Rights as they existed under the Third Amendment.

21.  Chicago Title knew about the underlying claims and the related threat of litigation as early as December 1997, when it wrote to IDC's counsel acknowledging same. *Id.*; Trial Tr. 48:3-51:4, May 26, 2023.

22.  Contemporaneous with Chicago Title's denial of additional insurance coverage, IDC attempted to negotiate a settlement with representatives of the Sub-Condominiums. The parties entered into a tolling agreement to continue those discussions. Ex. UU.

23.  Settlement attempts failed. Trial Tr. 72:19-73:20, May 24, 2023; Ex. 34.

24.  Following their decision to terminate all settlement discussions, the three Sub-Condominium Associations sued in Newport Superior Court against IDC and others claiming that the voting provisions proscribed by the FAR Declaration were illegal, that the Third, Fourth, and Fifth Amendments were invalid, and that IDC's Development Rights had therefore expired on December 31, 1994 ("America Litigation"). Ex. NNN.

25.  IDC retained its own counsel and did not seek representation from Chicago Title. Trial Tr. 32:16-18, May 26, 2023.

26.  On October 15, 1999, the Sub-Condominium Associations filed a lis pendens in the Newport land evidence records. Ex. 20. Along with providing record notice of the subject lawsuit, the lis pendens stated that IDC was "the present declarant and record owner of the North

Development Unit, West Development Unit, and South Development Unit." *Id.*

27.    Chicago Title had a copy of the lis pendens in its possession contemporaneous with the filing of it. Trial Tr. 49:13-51:5; 56:7-25, May 26, 2023. Moreover, in December 1999, Chicago Title began listing the October 15, 1999 lis pendens filed by the Sub-Condominium Associations in the America Litigation as a standard policy exception to all its Goat Island related title policies. Trial Tr. 56:7-57:12, May 26, 2023.

28.    IDC's counsel also communicated the existence and substance of the litigation to Chicago Title in communications related to the lis pendens. Ex. 32.

29.    Despite having contemporaneous knowledge of the Superior Court complaint, the lis pendens, and the Association's position on the re-argument before the Rhode Island Supreme Court, Chicago Title took no other action to defend IDC or directly involve itself in either settlement or litigation. Trial Tr. 53:20-23; 55:13-56:2, May 26, 2023. IDC had not made a formal written claim to Chicago Title.

30.    Even after the issuance of *America Condominium Association, Inc. v. IDC, Inc.*, 844 A.2d 117, 130 (R.I. 2004) ("*America I*"), where the Court ruled that the voting procedures contained in the FAR Declaration and employed in the amendments that had extended the period within which

Development Rights could be exercised (including the Third Amendment) were illegal, Chicago Title took no action to defend IDC or assist in any way. IDC had not made a formal written claim to Chicago Title.

31.    When presented with a draft amicus brief and draft motion to reconsider by IDC's counsel (Attorney Mark Russo), Chicago Title shared the same with counsel representing the Sub-Condominium Associations and, afterward, refused to authorize the filing of such on Chicago Title's behalf. Trial Tr. 63:14-64:16, May 26, 2023. Chicago Title had never given permission to file an amicus brief in its name.

32.    On April 8, 2005, the Rhode Island Supreme Court rendered its decision on re-argument, *America Condominium Association, Inc. v. IDC, Inc.*, 870 A.2d 434 (R.I. 2005) ("*America II*"), reaffirming its ruling that the 154 residential Sub-Condominium units were the units of the GIS Condominium and, as such, were statutorily required to vote on amendments, rather than the five Master Units that the FAR Declaration required. In *America II*, the Court found that the substantial completion requirement of the R.I. Condominium Act applied to the North, South, and West Units, and that those units had not been properly created because no development on those units was substantially complete. Under that rationale, the Court found that the North, South, and West Units were common elements of the GIS

8

Condominium since its inception, rather than units. *Id.* at 440–43. The case was then remanded to the lower court. *Id.* at 443. The underlying case remains open and pending on remaining claims. Trial Tr. 95:2-16, May 24, 2023.

## Chicago Title's Coverage Denial

33.  On July 8, 2005, IDC provided Chicago Title with a demand for coverage under the Policy. Ex. 44. Over the next two and a half years, Chicago Title investigated IDC's claim.

34.  Throughout the investigation, IDC answered a number of requests for documentation from Chicago Title and made its files available for Chicago Title representatives to review. Trial Tr. 103:17-105:9, May 24, 2023.

35.  Chicago Title retained outside counsel, Attorney Lawrence Heffernan to investigate the claim along with Attorney Kenneth Aran. Trial Tr. 81:9-14, May 26, 2023. Mr. Heffernan served as Chicago Title's defense counsel from the start until present counsel entered their appearance on January 15, 2014. ECF Nos. 69, 70.

36.  On August 11, 2006—more than a year after IDC's demand—Mr. Heffernan requested that it designate a corporate officer for an examination under oath ("EOU"). Ex. 56.

37.    IDC agreed to appear for the EUO.  It designated its president, Thomas Roos, who was examined under oath.  The EOU was suspended after several hours of questioning.  Trial Tr. 105:10-21, May 24, 2023.

38.    After months of silence from Chicago Title, IDC received a letter denying its claim.  Chicago Title claimed that there was no coverage because IDC failed to cooperate with its investigation (Policy Condition 5), IDC submitted late notice of the Claim (Condition 3), the Policy did not cover the North Unit, and any coverage under the Policy was precluded by Exclusion 3(d) as post-policy events.

39.    Chicago Title stated that it was prejudiced by the late notice of claim because there was a series of litigation and court cases that had come and gone before the notice of claim was filed.  Trial Tr. 35:15-19, May 26, 2023.  It also was prejudiced by its inability of present defenses, settle the case, and enforce the terms of the exclusions and conditions of the Policy.  Trial Tr. 75:22-76:5, May 26, 2023.

40.    Condition 3 provides that if Chicago Title is prejudiced by late notice of a claim, it can reduce amounts owed to IDC "to the extent of the prejudice."  Ex. 10 at 3..  Chicago Title invoked Condition 3 but did not make a payment to IDC that it believed represented the "extent of" prejudice.  *Id.*

41.    At no time before or after the denial has Chicago Title defended or offered to defend IDC in the underlying litigation.

**The Current Litigation**

42.    Following the denial, IDC commenced this action in the Rhode Island Superior Court against Chicago Title.  Chicago Title removed the action to this Court.  ECF No. 1.

43.    Chicago Title answered, asserting late notice and lack of cooperation among its affirmative defenses.  ECF No. 7.

44.    The Scheduling Order issued (ECF No. 12) and  discovery closed on July 19, 2011.  ECF No. 33.

45.    Chicago Title's First Motion for Summary Judgment was resolved.  *IDC Properties Inc. v. Chicago Title Ins. Co.*, 974 F. Supp. 2d 87, 102 (D.R.I. Sept. 30, 2013).

46.    In the decision, the Court found that:

(a) "IDC's loss of the North Unit was caused, at least in part, by the R.I. Supreme Court's determination that the Master Declaration's "voting scheme" contravened the R.I. Condo Act.  \*\*\*  The R.I. Supreme Court's invalidation of the Master Declaration's "voting scheme," caused, at least in part, IDC loss of development and special declarant's rights in the North Unit (Reserved Area)." *Id.* at 102.

(b) "[w]hen Chicago issued the Policy, the public record contained all the information necessary to conclude, as the R.I. Supreme Court did in *ACA I* and *ACA II*, that GIS's voting procedure violated the R.I. Condo Act" and "[a]t the time the Policy was issued the public record

contained the Master Declaration, the Master Bylaws, and the Third Amendment, putting Chicago on notice of GIS's voting procedure." *Id.* at 103.

(c) "[t]he Rhode Island Supreme Court has tied the loss of the North Unit to the invalid voting procedure in the Master Declaration, as well as the void Third, Fourth, Fifth and Sixth Amendments." *Id.* at 105.

(d) "[w]hile written notice was not prompt, undisputed evidence indicates that Chicago was aware of the litigation giving rise to IDC's claims before IDC provided formal written notice." *Id.* at 107.

(e) "[i]f Chicago shows that it is prejudiced, then it must also establish the extent of that prejudice." *Id.* at 108.

(f) "[h]ere, there is undisputed evidence that IDC through Mr. Roos cooperated and was examined under oath.   There is undisputed evidence that IDC participated in attempts to complete the EUO. Further, Chicago has not provided evidence that the EUO delays were 'substantial' and 'material.'" *Id.*

(g) "[t]he R.I. Supreme Court opinions tied that loss to both the topography of the West Unit in 1988 and the impermissible voting procedures in the Master Declaration, procedures followed by IDC." *Id.* at 109.

47.    Chicago Title did not raise the "apportionment" issue in its initial motion for summary judgment, but first raised it in its pretrial memo.  ECF No. 79.

48.    Chicago Title filed a Third Motion for Summary Judgment, claiming that IDC suffered no damages related to the South and West Units.  ECF No. 134.  The Court granted in part and denied in part.  *IDC Properties Inc. v. Chicago Title Ins. Co.*, 540 F. Supp. 3d 220 (D.R.I. May 21, 2021). Chicago Title moved to reconsider, and the Court granted that motion, disposing of all claims.    *IDC Properties Inc. v. Chicago Title Ins. Co.*, C.A. No. 09-632-JJM-PAS, 2021 WL 4355259 (D.R.I. Sept. 7, 2021).  IDC appealed.  ECF No. 149.

49.    The First Circuit affirmed in part and reversed in part.  *IDC First Circuit*, 42 F.4th at 14.  In doing so, the First Circuit held that the Policy did not cover the loss associated with the North Unit.  *Id.*  However, the First Circuit affirmed coverage for the South and West Units and remanded the matter for a trial on damages.  *Id.*

**The Trial**

50.    The Court held a bench trial where the parties presented evidence through stipulated exhibits and lay and expert witness testimony.  The Court also visually inspected Goat Island and comparable properties throughout Newport, Rhode Island.

51.   Peter Scotti, IDC's expert, valued the West Unit at $560,000 and the South Unit at $540,000 as of December 19, 1997.  Trial Tr. 145:10-15, May 25, 2023.

52.   Webster Collins, Chicago Title's expert, valued the West Unit at $146,000 and the South Unit at $154,000 as of December 19, 1997.  Trial Tr. 115:17-23, May 26, 2023.

53.   Mr. Roos acknowledged that the late 1990s values of Harbor Houses Units 18 and 19 were relevant comparable sales due to their proximity to the South and West Units on Goat Island.  Unit #18 sold in early 1997 for $625,000.  This was a single-family house.  IDC sold Unit #19, also a completed house, in 1995 to Mr. Roos' grandfather for $600,000.  Trial Tr. 108:22-109:1, 113:13-19, May 24, 2023.

## II.   CONCLUSIONS OF LAW

The Court has jurisdiction over this dispute based on the parties' diversity of citizenship and the requisite amount in controversy.  28 U.S.C. § 1332(a) (2012). When sitting in diversity, a federal court must abide by state substantive law.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  The Court therefore turns to Rhode Island law to resolve the issues presented.

### A. VALUE OF THE SOUTH AND WEST UNITS

The opportunity to construct buildings on the South and West Units was clearly stated in Section 2.3 of the FAR Declaration where IDC, as owner of those

Units, reserved the right to "construct buildings and other improvements ... located within the boundaries of the" South and West Units. *IDC First Circuit*, 42 F.4th at 11. The way the Rhode Island Supreme Court interpreted the Rhode Island Condominium Act in the litigation leading to this title insurance coverage dispute, however, barred IDC from constructing buildings and other improvements on the South and West Units in perpetuity. *Id.* at 10 (citing *America II*, 870 A.2d at 442-43; *America I*, 844 A.2d at 132). But, pertinent to this dispute, the First Circuit determined that "the fact that IDC is barred from doing so under Rhode Island law is not pertinent to whether CTIC insured IDC's right to do so." *Id.*

The First Circuit then turned to the Policy "to determine what 'right, title, and interest' is insured." *Id.* It reversed[2] this Court's grant of summary judgment for

---

[2] This Court held, and the First Circuit affirmed, that IDC is not entitled to coverage under the Chicago Title Policy relating to its losses associated with the North Unit. Now, IDC seeks damages relating to the loss of value that resulted from the invalidation of IDC's voting rights associated with the North Unit based on the First Circuit's emphasis on the "all right, title and interests" language. *IDC First Circuit*, 42 F.4th at 11. IDC argues that the "all right, title and interests" language also insured its voting rights under the FAR Declaration including the right to control voting on the Fourth and Fifth Amendments. Chicago Title argues that this is IDC's attempt to resurrect a dead claim for title insurance coverage on the North Unit.

The Court agrees with Chicago Title. The Policy insures title, not voting rights. Any linguistic gymnastics to interpret the Policy to find coverage as IDC suggests is contrary to this Court's previous holding that "IDC Properties lost ownership of the North Unit not because of a title defect in its declarant and developmental rights, but because it had built no buildings on the North Unit when it filed the Sixth Amendment." *See IDC Properties, Inc. v. Chicago Title Ins. Co.*, 540 F. Supp. 3d at 226. The Court held in the alternative "that there is no coverage [for the North Unit] because the loss was caused by a defect IDC Properties, the insured, created and therefore Policy exclusion 3(a) applies." *Id.* at 226 n. 8. The First Circuit upheld both these grounds for dismissal. *IDC First Circuit*, 42 F.4th at 9-10, 14 n. 2. Therefore, IDC's request that this Court revisit past rulings and reengage consideration of damages related to the North Unit is DENIED.

Chicago Title, finding that the record contained "evidence from which a value could be assigned to the right to construct buildings" in the South and West Units. *Id.* at 11. The First Circuit specifically pointed out that IDC's expert report contained calculations based on "the development of the buildings allowed in the FAR Declaration, along with market factors and the particular characteristics" of the South and West Units. *Id.* at 11, 12.

Both experts agree that the "comparable sales approach," considering "location and character of the property, proximity in time of the comparable sale, and the use to which the property is put" is the appropriate way to determine the value of the South and West Units. *Warwick Musical Theatre, Inc. v. State*, 525 A.2d 905, 910 (R.I. 1987). Considering the trial evidence and prevailing Rhode Island law, the Court agrees. Real estate value "must be established, wherever feasible, on the basis of comparable sales cited by an expert witness who has laid a prior foundation consisting of the reasons or factors upon which he has relied in arriving at his opinion." *Wordell v. Wordell*, 470 A.2d 665, 667 (R.I. 1984). "[The] trial justice retains the authority to determine the credibility of each expert's evidence, and to decide whether to accept or reject a proffered valuation." *Sun-Lite P'ship v. Town of W. Warwick*, 838 A.2d 45, 48 (R.I. 2003).

Now the Court turns to the record developed at trial to determine the value, if any, of the right to construct buildings on the South and West Units.

### Peter Scotti

Mr. Peter Scotti produced an expert report (Ex. 63) and testified at trial. He inspected the properties and examined the Newport real estate market as it stood on December 1997 using MLS ("Multiple Listing Service") data and sales data that the Warren Group, a local source for real estate and financial data analysis, provided. He went to the Newport Tax Assessor's office, Planning Department, Zoning Office, and Newport City Hall to verify the information he found in the original resources and to verify that comparable properties were truly comparable, considering whether there were easements, encumbrances, or restrictions. He compiled comparable sales data through municipal records, MLS data, and interviews with other Newport real estate professionals.

Mr. Scotti opined that Harbor Houses #18 and #19 were particularly comparable to the South and West Units due to their location on Goat Island itself and proximity to the Units at issue. He Scotti opined that the South Unit (Parcel III in his report) and West Unit (Parcel II in his report) were best suited for single-family homes. He estimated that the market value for the West Unit as of December 19, 1997 was $560,000 and valued that South Unit as $540,000 for a combined loss of $1,100,000. The Court finds Mr. Scotti's opinions and testimony to be extremely credible and based on a well-established foundation.

### Webster Collins

Mr. Webster Collins also produced an expert report (Ex. QQQQ) and testified at trial. According to his report, he reviewed 1997 and 1998 MLS records; researched comparable commercial land sales within Newport and Newport County for 1997;

inspected the subject properties; identified and considered characteristics that may have a legal, economic, or physical effect on the subject; inspected the micro and/or macro market environments with respect to physical and economic factors relevant to the valuation process; interviewed with regional and/or local market participants; and conducted regional and/or local research about applicable tax data, zoning requirements, flood zone status, demographics, income, and expense data, and comparable listing, sale and rental information.

Mr. Collins agreed that the best use of the South and West Units is for construction of single-family homes. He estimated that the West Unit's value as of December 19, 1997 was $146,000 and the South Unit's value was $154,000. To come to these values, he cited sales not from 1997 but from 1994 and 1996. These properties were not on the water and did not have direct water views[3] that could come even close to those on Goat Island. One is on a pond. Mr. Collins testified that he discounted the value of the South and West properties by 25% because those properties had easements and sea wall and foundation repairs, which made them less desirable and valuable. In contrast, while he did note in his report that there are numerous easements, he concluded that "the property does not appear to be adversely affected by any easements or encroachments." Ex. QQQQ at 14. Mr. Collins further discounted the value of the South and West Units because he considered that the allocated ownership interests of the South and West Units were high—10.12% and

---

[3] The property at 116 Old Beach Road apparently had a water view from the second floor.

9.6% respectively, translating to approximately $33,000 per year for the South Unit and $31,000 per year for the West Unit in extra costs.

The Court did not find Mr. Collins testimony credible.  While Mr. Collins' process was thorough, the Court finds that his comparables were not in fact comparable, ultimate conclusions were not at all credible, and are not in line with the comparable sales approach.

### Harbor Houses #18 and #19

IDC asks the Court to use the 1997 sale of Harbor Houses #18 ($625,000) and the 1995 sale of Harbor Houses #19 ($600,000)[4] to determine the South and West Unit values.  Allocating the purchase price of the sales between the land (25%) and the buildings (75%) as is typically done and calculating the price per square foot as a comparable property, the South Unit's comparable value would be between $966,971 and $1,007,382 and the West Unit's comparable value would be between $916,819 and $955,134.  IDC advocates for an upward adjustment, arguing that the South and West Units are even more valuable than the Harbor Houses because they look out on Narragansett Bay, are larger lots, and are more attractive.

Mr. Collins does not appear to have considered Harbor Houses #18 and/or #19 as comparable properties.

---

[4] IDC asks the Court to further adjust the calculations as to Harbor Houses #19 up to $1,000,000 because it was sold in 1995 not 1997, was not an arm's-length transaction, was subject to a right to repurchase, and involved the exchange of another condominium unit in addition to the $600,000 purchase price.  This would change the calculation to $43 per square foot and supports a finding that the South Unit should be valued at approximately $1.6 million and the West Unit at approximately $1.5 million.

## Conclusion as to the Value of the South and West Units

As finder of fact and applying the legal principles of the comparative sales approach, the Court concludes that Mr. Scotti's valuation as of 1997 of the South Unit at $540,000 and West Unit at $560,000 is the most appropriate considering all the factors as to the property itself. These two parcels of land are stunning waterfront parcels, in a most desirous location–and their value in 1997 must reflect that.

### B. CHICAGO TITLE'S DEFENSES

Chicago Title asserts several defenses[5] to IDC's claim that it breached the insurance by denying its claim.

#### 1. Late Notice

Chicago Title argues that IDC failed to promptly notify it of the loss and that it was prejudiced by this late notice. Policy Condition and Stipulation 3 provides that the insured "shall notify the Company promptly in writing . . . in case knowledge shall

---

[5] It appears from the post-trial briefing that Chicago Title is not pressing its defense that IDC's lack of cooperation was a valid reason for denying its claim. But because it was a reason given in the denial letter and IDC addressed it in its briefing, the Court will briefly analyze it here. Chicago Title bears the burden to prove this defense. *Ogunsuada v. Gen. Accident Ins. Co.*, 695 A.2d 996, 999 (R.I. 1997). "Any alleged breach of a cooperation clause ... has to be substantial as well as material in order to relieve the insurer of its liability under the policy, and a mere technical or inconsequential lack of cooperation would be insufficient to void the policy and the liability of the insurer." *Id.* There was no evidence or testimony about Chicago Title's inability to investigate the claim due to a substantial and material lack of cooperation or about how IDC's failure to cooperate with the claims investigation–which seemed to boil down to Mr. Roos' request to conclude his deposition in Florida instead of Boston–prejudiced Chicago Title. *See* Trial Tr., 106:4-107:10, May 24, 2024; Ex. 57-61.

come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy . . . ." Ex. 10 at 3. If prompt notice is not given, then "all liability of the company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice." *Id.*

"An insured's compliance with policy provisions relating to notice is a condition precedent to an insurance company's liability." *Harleysville Worcester Ins. Co. v. High Tech Constr., Inc.*, 568 F. Supp. 3d 152, 154 (D.R.I. 2021) (citing *Cinq-Mars v. Travelers Ins. Co.*, 218 A.2d 467, 471 (R.I. 1966)). "Practically, in deciding whether notice is timely and adequate, a court should consider several factors including the length of the delay, the reasons for the delay, and how the insurer is affected by any delay." *Harleysville*, 568 F. Supp. 3d at 154 (citing *Pickering v. Am. Employers Ins. Co.*, 282 A.2d 584, 592-93 (1971)). "[A]n insurer cannot deny coverage based on inadequate notice unless it has been prejudiced." *Id.* at 155 (citing *Pickering*, 282 A.2d at 593). "Where an insurance company seeks to deny coverage under a policy exclusion, it carries the burden of proving that the exclusion applies." *Am. Title Ins. Co. v. East West Fin.*, 16 F.3d 449, 455 (1st Cir. 1994).

Chicago Title, understandably, hangs its argument on the Court's acknowledgment that IDC's July 2005 notice of claim "was not prompt." *IDC*

*Properties, Inc. v. Chicago Title Ins. Co.*, 974 F. Supp. 2d at 106. But Chicago Title does not dispute that it had actual notice; it knew there was a defect as early as December 1997 when Mr. Meyer refused to issue additional coverage due to his knowledge of the pending issues. *See* Ex. 29. And Mr. Meyer testified that he had a copy of the lis pendens and complaint in 1999, which alleged that IDC's title and ownership was in question. *See* Trial Tr. 48:19-49:1; 49:19-22; 50:5-51:4; 53:4-25; 54:13-55:4, May 26, 2023. "[I]t is almost universally held that the test is whether the insurer was sufficiently informed of the occurrence within a time which would be reasonable under all the circumstances of each particular case. If the insurer is so informed, it makes little difference who actually gave notice." *Sinclair Oil Corp. v. N.H. Ins. Co.*, 268 A.2d 281, 285 (R.I. 1970); *Cooley v. John M. Anderson, Co.*, 443 A.2d 435, 437 (R.I. 1982) (notice to an insurer from one source is sufficient notice to an insurer from another). The Court finds that Chicago Title had notice in the early stages of IDC's title issues, triggering its duties under the Policy.

Even assuming IDC's notice to Chicago Title was not prompt, it is Chicago Title's burden to prove actual prejudice and the extent of that prejudice. Chicago Title underwriter and attorney Mark Comstock testified that it was prejudiced but did not give any specific examples or testify about the extent of the prejudice. Understanding that this type of prejudice is not easy to monetarily quantify, there was no evidence or testimony at trial in support of Chicago Title's assertion that it could have avoided this protracted litigation by acting as an intermediary between the individual unit owners and Mr. Roos to avoid escalation or by settling the dispute

outside the courtroom. The Court did not hear from any Chicago Title employee who was involved with the claim investigation and who could testify about the effect of the late notice on Chicago Title's ability to respond to the claim. There is no evidence of what it "would have done even if [IDC's] claim had been filed much earlier." *Cooley*, 443 A.2d at 437.

When IDC gave official notice in 2005, Chicago Title undertook an investigation and denied the claim based on late notice and lack of cooperation. Because Chicago did not produce any non-speculative evidence that it was prejudiced, or the extent of the prejudice caused by IDC's less than prompt notice—and the evidence shows that Chicago did know years before that IDC's title to the properties were in question—its late notice defense to IDC's breach-of-contract claim fails.

### 2. Collateral Estoppel

Chicago Title argues that IDC is now estopped from relying on Mr. Scotti's December 1997 valuations of the South and West Units because its predecessor, Island Development Corporation, challenged the Newport Tax Assessor's 1989 and 1990 tax assessment of those Units by arguing that they had no value because approval of any additional units was too speculative. *Island Dev. Corp. v. Booth*, No. NC870503, 1992 WL 813490, at *3 (R.I. Super. Jan. 29, 1992). IDC argues that collateral estoppel does not apply because there are not identity of issues and no privity between IDC and Island Development Corporation.

Collateral estoppel applies in cases with identity of issues, a final judgment on the merits, and privity between the parties to the current and prior action. *Ret. Bd.*

*of Employees' Ret. Sys. of State v. DiPrete*, 845 A.2d 270, 282 (R.I. 2004). The issues raised in the *Booth* decision relating to Newport's property tax assessment are different from those in this title insurance coverage case. While the tax case discussed the likelihood that Island Development Corporation could develop the land, this case is rooted in whether Chicago Title's Policy insured IDC's title to the land. Moreover, the tax values set by a municipality in the early 1990s do not predict a fair market value determination seven or eight years later. Property tax evaluation and fair market sale values are not calculated the same and cannot meet the "'absolute due process prerequisite' of issue identity" for collateral estoppel to apply. *Tarrify Props., LLC. v. Cuyahoga Cty.*, 2020 WL 7490096, at *4 (N.D. Ohio Dec. 21, 2020); *see also Booth*, No. NC870503, 1992 WL 813490, at *2 (assessed value and fair market value are not equivalent because assessed value of Newport property at that time was 60% of fair market value).

In any event, there is no privity between IDC and Island Development Corporation. "Parties are in privity when 'there is commonality of interest between the two entities' and when 'they sufficiently represent' each other's interests." *Duffy v. Milder*, 896 A.2d 27, 36 (R.I. 2006) (quoting *Commercial Union Ins. Co. v. Pelchat*, 727 A.2d 676, 680 (R.I. 1999)). Thomas Roos did not assume the role of President of Island Development Corporation and Globe's interests were not transferred to that corporation until December 1992, eleven months after the Rhode Island Superior Court decided the tax assessment issue. While there is a long history of Mr. Roos' involvement with the Goat Island developments and companies emanating from

24

them, the Court finds that there is no privity between the entities on the tax assessment issue. Therefore, the Court finds that Chicago's collateral estoppel argument fails in the face of a lack of evidence of issue identity and privity.

### 3. Apportionment

Chicago Title argues that the maximum policy benefit should be apportioned, citing the Policy's Condition 8.[6] In the face of IDC's allegation that Chicago Title did not raise this defense until 2014 after discovery had closed, Chicago Title argues that the apportionment defense was part of its Seventh Affirmative Defense, which states that IDC "has not suffered an insurable loss."

The Court finds that Chicago Title has waived any apportionment defense. First, the Court finds that the language of the Seventh Affirmative Defense does not put IDC on notice that Chicago Title intended to seek an apportionment of damages. The Seventh Affirmative Defense asserts that IDC has not suffered an insurable loss while Condition 8 assumes there has been a loss but that coverage for the loss should be limited on a pro-rata basis. Because it is not an exclusion based on there NOT being an insurable loss, it is incongruent to the language of Chicago Title's Seventh Affirmative Defense.

Second, when its 30(b)(6) witness Kenneth Aran, Esq. testified about the bases of Chicago Title's Seventh Affirmative Defense, he said nothing about apportionment

---

[6] Condition 8 limits coverage to the pro-rata value of the Policy in comparison to the parcel as a whole. Ex. 10 at 4.

or Policy Condition 8.  Because Chicago Title did not claim that apportionment was part of that affirmative defense during discovery, it is barred now from so claiming.

Finally, Chicago Title did not admit evidence in favor of apportionment of damages.  Policy Condition 8 requires proof of the pro-rata value "of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy . . . ."  Mr. Collins, Chicago Title's expert, did not discuss apportionment in his valuation of the damages or value Goat Island as a whole so that he could pro-rate the value of each Unit.  In its post-trial briefing, Chicago Title advocates for a formula[7] to calculate the apportioned damages but it presented no evidence during trial for apportionment or evidence of an apportionment formula, essentially asking the Court to speculate.  Therefore, even if the Court got beyond Chicago Title's failure to raise apportionment in a timely fashion, there is no reliable evidence in the record to determine an appropriate apportionment.

## C. ATTORNEYS' FEES

IDC seeks an unspecified amount of attorneys' fees associated with defending its title.  While it is true that "[a] duty to defend arises if the factual allegations contained in the *complaint* raise a reasonable possibility of coverage[,]" *Aetna Cas. & Sur. Co. v. Kelly*, 889 F. Supp. 535, 541 (D.R.I. 1995), and the duty to defend is

---

[7] Chicago Title asserts that IDC allocated $400,000 to the development of the North, South, and West Units, which was close to the value that the Rhode Island Superior Court assessed in *Booth*.  Because the North Unit was larger and more valuable, Chicago Title speculates that half would be attributable to the South and West Units–so only about 2% of the value of the land IDC insured.  Two percent of the Policy limit is $200,000 which is what Mr. Collins opined the South and West Units were worth, minus an adjustment for high condominium expenses.

broader than the duty to indemnify, *Caruso v. Omni Hotels Mgmt. Corp.*, 61 F.4th 215, 224 (1st Cir. 2023), IDC was required under Policy Condition 4(a) to request that Chicago Title provide for its defense in writing. There was no evidence at trial showing that IDC or Mr. Roos requested such a defense and Mr. Roos seemed to be determined to direct the course of all the Goat Island related disputes himself and with his attorneys of choice. The Court finds that IDC cannot now fault Chicago Title and penalize it by assessing attorneys' fees after the fact.

## III.    CONCLUSION

For all the reasons set forth in these findings of fact and conclusions of law, the Court awards IDC $1,100,000.00, plus interest and costs. IDC's request for attorneys' fees is DENIED.


IT IS SO ORDERED.

_____

John J. McConnell, Jr.
United States District Chief Judge

March 29, 2024