## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| IDC PROPERTIES, INC.,<br>    Plaintiff,<br><br>    v.<br><br>CHICAGO TITLE INSURANCE<br>COMPANY,<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 09-cv-632-JJM |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief Judge.

After sixteen years of litigation, multiple decisions, appeals, a bench trial, and ruling on the merits of the contract claims, the final piece of this conflict over development rights on Goat Island and title insurance is before the Court. The only claim that remains is Plaintiff IDC Properties, Inc.'s bad-faith claim (Count III), which the Court severed, pertaining to Defendant Chicago Title Insurance Company's conduct in denying insurance coverage for the South and West Units. Chicago Title moves for summary judgment and moves in limine to exclude certain evidence and expert testimony from the bad faith trial. For the reasons below, the Court GRANTS both the Motion in Limine (ECF No. 184) and the Motion for Summary Judgment (ECF No. 185).

## I.    FACTS

Chicago Title issued a $10 million title insurance policy to IDC on October 21, 1994 ("the Policy"). It insured IDC's "rights, title, and interest" in the South and West

Units, its developmental and special declarant rights, and the fifty-nine residential condominiums. One of IDC's developmental rights was the right to declare the Reserved Area as an airspace Master Unit. IDC did so declare as to the North Unit on December 28, 1994, two months after the Policy for the South and West Units issued.

Three years later in December 1997, IDC requested title insurance for the North Unit from Chicago Title, which Chicago Title refused to provide because it knew individual condominium owners threatened litigation over several disputed issues. IDC obtained a title policy from Commonwealth Land Title Insurance Company for the North Unit before developing and building the Regatta Club, a restaurant and banquet facility, on that land even though IDC knew that its right to do so was in dispute. A lawsuit between the condominium owners and IDC followed in the Rhode Island Superior and Supreme Courts, *America Condominium Association v. IDC, Incorporated.* (*America* litigation). IDC did not notify or seek representation from Chicago Title or Commonwealth in those cases but retained other counsel. The outcome of the first case was a decision by the Rhode Island Supreme Court that IDC's development rights had expired on December 31, 1994 because it did not obtain unanimous consent of the condominium owners and therefore title to the North, West, and South Units vested in those condominium owners in fee simple. *Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 844 A.2d 117, 130-33 (R.I. 2004) (*America I*). After this decision, IDC notified Commonwealth of a title defect claim. It did not notify Chicago Title.

IDC moved for reconsideration before the Rhode Island Supreme Court.  In *America II*, the Rhode Island Supreme Court found that the North, South, and West Units had not been properly created because development on those units was not substantially complete when IDC declared them.  *Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 870 A.2d 434, 439-43 (R.I. 2005) (*America II*).  Where *America I* found that IDC had good title to the South and West Units (so no claim under the Chicago Title insurance policy), *America II* made Chicago Title vulnerable to a claim for all three Units.  *Id.* In July 2005, for the first time, IDC made a claim on the Chicago Title Policy, three months after the *America II* decision but six years after the first case was filed.

Chicago Title was responsive to IDC's claim, acknowledging it four times in July 2005.  ECF No. 186 ¶ 2.  At the end of that month, it requested various documents from IDC to "facilitate [] investigation of this matter."  *Id.* ¶ 3.  IDC was asked to provide pertinent documentation but failed to do so.  *Id.*  Two weeks later, Chicago Title requested the documentation again.  *Id.* ¶ 4.  IDC again did not comply. *Id.*  ¶ 5.  Three months later in November 2005, Chicago Title requested the documents for a third time, advising IDC that it could not begin to process the claim until it had the requested documents.  *Id.*  At the end of November 2005, five months after Chicago Title's initial request, IDC's new attorney Peter Haley ("IDC's Attorney") provided some, but not all, of the requested documents.  *Id.* ¶ 6.

On December 5, 2005, seven days after IDC sent some of the requested documents, Chicago Title opened IDC's claim.  *Id.* ¶ 8.  Within two weeks, Kenneth Aran, a Senior Vice President at Chicago Title ("Chicago Title's SVP"), requested a

brief description regarding the exposure and nature of the title defect for the new claim, received a brief summary, and a Significant Claim Report ("Report") from another Chicago Title attorney. *Id.* ¶ 9. The Report noted in part that "the insured provided late notice of the claim. It first learned of the suit in 1999, and filed a claim in 2005, after the final reargument was determined. Late notice may be grounds for a denial if there is prejudice." The Report cited two late notice cases and observed that "[t]he delay in this matter was far greater than the cases outlined above." *Id.* ¶ 11. At the same time, Chicago Title continued to ask for the documents from IDC it had not received in response to its July requests, as well as other material.[1] *Id.* ¶ 12. It also requested the complete title file from Chicago Title's East Providence office, as well as other information about the claim. *Id.*

Beginning in January 2006, Chicago Title updated the progress of its investigation through monthly internal reporting. *Id.* ¶ 13. The initial report focused in part on IDC's late notice of the claim, and cited caselaw where insurers' denial decisions based on late notice were upheld. *Id.* Later that month, Chicago Title's SVP wrote to IDC's Attorney, asking for information about the late notice, noting that "[t]here are a number of potential relevant matters pertaining to this claim, but initially we request the insured's explanation for the delay in putting Chicago Title on notice of the claim." *Id.* ¶ 14. IDC's Attorney responded two weeks later, asserting that the facts that gave rise to the claims under the Policy were first understood after

---

[1] In addition to late notice, the Policy stated that it reserved the right to deny a claim based on noncompliance.

the *America II* decision, and also suggested that Jeffrey Meyer, an Assistant Vice President at Chicago Title ("Chicago Title's AVP") testified in a lawsuit filed by Commonwealth against IDC that he had notice of the *America* litigation. *Id.* ¶ 15.

Chicago Title then hired outside coverage counsel, the firm of Robinson + Cole and attorney Lawrence Heffernan ("Chicago Title's Outside Coverage Counsel") in early 2006. *Id.* ¶ 18. A few months later, he wrote to IDC's Attorney requesting a Proof of Loss[2] and advising that Chicago Title intended to schedule an examination under oath ("EUO") of the person at IDC with knowledge of its claim and loss, as well as the underlying litigation, and requested "copies of all records, books, ledgers, checks, correspondence and memoranda, which reasonably pertain to the loss or damage claimed by your client" as well as all litigation documents from IDC's other cases. *Id.* ¶¶ 21-22. Chicago Title representatives continued to review and analyze the file and to research coverage issues. *Id.* ¶ 23. After Chicago Title's Outside Coverage Counsel talked to Chicago Title's AVP regarding his notice of the underlying litigation, he concluded that Chicago Title's AVP did not believe that the *America* case was a title challenge, and that his knowledge did not constitute notice under the Policy because it was not made in writing to the claims department as the Policy requires. *Id.* ¶ 24.

---

[2] Policy Condition 5 states in part that "[i]n addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided to the company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured clamant shall ascertain the fact giving rise to the loss or damage." ECF No. 186-4 at 11.

Chicago Title's attorneys reviewed pleadings in the underlying state court case and appeals, the Commonwealth case, and some from IDC's malpractice action against its previous counsel. *Id.* ¶ 25. In the summer of 2006, Chicago Title and its attorneys continued to investigate and analyze the claim and communicated those efforts to IDC through status updates, indicating that they were evaluating both defenses and the potential value of any loss. *See id.* ¶¶ 27-46. Chicago Title also worked on scheduling the EUO; IDC designated Thomas Roos ("IDC's Value Expert Roos") who gave testimony in November 2006. *Id.* ¶¶ 36-37, 40. The EUO was suspended before it was completed; attempts to reschedule it failed multiple times, with both parties contributing to the difficulty. *Id.* ¶¶ 43-46, 48-50. Chicago Title's Outside Coverage Counsel wrote to IDC, threatening to deny the claim because of his perception that IDC was to blame for the incomplete EUO. *Id.* ¶ 50. Chicago Title notes that IDC did not respond to the letter; IDC counters that the letter did not ask for a response and asserts that it was sent to an attorney that no longer represented it, Chicago Title knew this, and sent the letter to its previous counsel anyway.[3] ECF No. 195 ¶¶ 51-52. Nevertheless, Chicago Title's Outside Coverage Counsel began preparing draft denial letters. *Id.*

At the end of January 2008, Chicago Title still had not heard anything from IDC, so Chicago Title's Outside Coverage Counsel sent the coverage denial letter to

---

[3] IDC also blames Chicago Title's failure to appropriately notify its counsel as the reason its response to the EUO request was delayed and it did not respond to the denial letter. ECF No. 195 ¶ 55. IDC asserts that Chicago Title sought to take advantage of this gap in representation to deny the claim in bad faith. *Id.*

IDC's Attorney.  ECF No. 186 ¶ 54.  Chicago Title denied coverage for these reasons: IDC failed to cooperate with its investigation (Policy Condition 5); IDC submitted late notice of the Claim (Condition 3); the Policy did not cover the North Unit; and any coverage under the Policy was precluded by Exclusion 3(d) as claims attacking or created after the date of the Policy that fall outside the coverage the Policy afforded. ECF No. 186-1 at 13-17.  Chicago Title stated that it was prejudiced by the late notice of claim because there was a series of litigation and court cases that had come and gone before the notice of claim was filed.  *Id.* at 6-7.  It was also prejudiced by its inability to present defenses, enforce the terms of the exclusions and conditions of the Policy, and participate in the multiple attempts to settle the case.  *Id.*

IDC filed this suit in 2009.  The parties engaged in extensive discovery from its inception.  The Court initially denied Chicago Title's Motion for Summary Judgment, finding disputed issues of fact.  *IDC Prop., Inc. v. Chicago Title Ins. Co.*, 974 F. Supp. 2d 87 (D.R.I. Sept. 30, 2013).  Chicago Title filed another Motion for Summary Judgment, and the Court determined there was no coverage for the North Unit, but found disputes existed as to the South and West Units.  *IDC Prop., Inc. v. Chicago Title Ins. Co.*, 540 F. Supp. 3d 220, 221 (D.R.I. May 21, 2021).  Chicago Title moved to reconsider, leading the Court to find the Policy did not cover the South or West Units either, dismissing the entire case.  *IDC Prop., Inc. v. Chicago Title Ins. Co.*, C.A. No. 09-632-JJM-PAS, 2021 WL 4355259, at *1 (D.R.I. Sept. 7, 2021).  IDC appealed.  The First Circuit affirmed in part and reversed in part.  *IDC Prop., Inc. v. Chicago Title Ins. Co.*, 42 F.4th 1, 14 (1st Cir. 2022).  In doing so, the First Circuit

held that the Policy did not cover the loss associated with the North Unit but affirmed coverage for the South and West Units and remanded the matter for a trial on damages.  *Id.*  This Court held a bench trial and awarded IDC $1,100,000.00, plus interest and costs, based on the value of the South and West Units.  ECF No. 176.

The only remaining issue[4] is IDC's bad-faith claim.  Though IDC does not dispute that Chicago Title requested an extensive list of documents relating to the claim and underlying litigation,[5] it argues that Chicago Title directed its attorneys to deny coverage without thoroughly investigating the claim in bad faith.  ECF No. 186 ¶¶ 21-22.  IDC asserts that Chicago Title's legal research was limited to looking for ways to deny coverage based on late notice alone.  *Id.* ¶¶ 21, 26.

As evidence of bad faith, IDC relies on an unsigned 1997 draft endorsement to the Policy and an unsigned transmittal letter for the draft endorsement, addressed to IDC's lawyer Arthur Murphy ("IDC's Outside Attorney").  *Id.* ¶ 56.  Chicago Title initially produced this endorsement ("Endorsement 1") in response to IDC's request for production of documents but neither party raised it in support or defense of their

---

[4] IDC argues that Count II, its claim for breach of the covenant of good faith and fair dealing, also remains.  It argues that omitting Count II from the severance motion was a clerical error and urges the Court to consider it along with Count III as that claim is the common law version of the Count III statutory bad-faith claim.  The Court has found no precedent in Rhode Island law allowing courts to sever a common law breach of the covenant of good faith and fair dealing claim like it would a bad-faith claim.  *See McNulty v. Chip*, 116 A.3d 173, 185 (R.I. 2015) ("a claim for breach of the implied covenant of good faith and fair dealing does not create an independent cause of action separate and apart from a claim of breach of contract.").  Only the bad-faith claim was severed, the bench trial properly proceeded on the contract claims, and the Court's decision thereon disposed of all claims except Count III.

[5] IDC also disputes what documents Chicago Title reviewed in its investigation when it stated that it reviewed the entire file.

case until March 2025 and no court has considered its relevance or admissibility as to any claim until these motions. IDC argues that Chicago Title acted in bad faith in its investigation because it either concealed this document or did not consider it in its coverage determination. Chicago Title argues that there is no evidence that Endorsement 1 was issued and valid. As support for this position, Chicago Title cites IDC's Outside Attorney's deposition where he testified that he did not recall any amendments to the Policy. *Id.* ¶ 57. Chicago Title's AVP also testified that he does not recall any endorsement of the Policy. *Id.* ¶ 58. And Chicago Title's Outside Coverage Counsel testified that he had no knowledge or information whether the endorsement was ever actually issued and signed. ECF No. 195 ¶ 59.

Post bad-faith discovery, Chicago Title filed this Fourth Motion for Summary Judgment on Count III (ECF No. 185) and a Motion in Limine to Exclude IDC's Expert Testimony and Related Evidence (ECF No. 184).[6]

## II.  MOTION IN LIMINE

Both the First Circuit and this District Court found that there was no title insurance to cover the North Unit. As the parties moved toward trial on the bad-faith claim, IDC disclosed in March 2025 that it intended to present expert and lay testimony and evidence about coverage for and value of the North Unit. Chicago Title moves in limine to exclude testimony from three witnesses and any reliance on

---

[6] Typically, a court would rule on a motion for summary judgment and, if it denies it, move on to deal with motions in limine at some point before trial. But nothing is typical about this case; because of the nature of the evidence and testimony raised in Chicago Title's Motion in Limine, and IDC's response to it, the Court will discuss the Motion in Limine first.

Endorsement 1 as evidence that the North Unit was covered or should have been covered.

As mentioned, this is the first time in this sixteen-year-old case the Court has heard of Endorsement 1[7] and of IDC's view of its significance as to the North Unit. IDC acknowledges that earlier decisions have held that the Policy did not cover the North Unit but argues that this evidence is relevant to Chicago Title's bad-faith denial of its claim. Relying on Endorsement 1, IDC's expert Eugene McCullough ("IDC's Coverage Expert McCullough") opines that its language would have extended the Policy date so that it would have included coverage for the Fourth, Fifth, and Sixth Amendments. The North Unit therefore would have been covered. It was Chicago Title's investigation conducted in bad faith that caused Endorsement 1 to be concealed until now. He opines that if Endorsement 1 was uncovered earlier in the claims process, it "would have avoided crafting defenses and arguments that those Amendments were never insured." ECF No. 184-2. IDC's Coverage Expert McCullough also theorizes that an original Chicago Title Policy issued to IDC's predecessor, Globe Manufacturing, promised to extend coverage for areas like the

---

[7] Some background on Endorsement 1: IDC's Attorney wrote to Chicago Title's AVP in September 1996 to ask for a change in the Policy. Endorsement 1 was drafted; it specifies that "This endorsement shall not be valid or binding until countersigned by an authorized signatory." ECF No. 184-6 at 2. The record does not contain a signed copy. A few months later, Tim More, IDC's Attorney's partner, asked Chicago Title's AVP to insure the North Unit before construction on the Regatta Club began. Chicago Title's AVP refused, explaining in a memo to Mr. More that he disagreed with IDC's Expert Roos' belief that he did not need unanimous consent of all the individual unit owners. IDC argues here that Endorsement 1 is valid and would have extended the Policy date such that the Fourth, Fifth, and Sixth Amendments to the Declaration, specifically the North Unit, would have been insured under the Policy.

North Unit.  Building from these opinions, IDC's expert Peter Scotti ("IDC's Value Expert Scotti") opines about the North Unit's value and Thomas Roos ("IDC's Value Expert") was expected to testify about how much money was spent to construct the Regatta Club on the North Unit.  Chicago Title moves in limine to exclude all evidence related to the North Unit, including the two expert's opinions, IDC's Value Expert Roos' lay opinion, and Endorsement 1.

Both this Court and the First Circuit found that the North Unit was not covered under the Chicago Title Policy—so any evidence, opinion, or expert testimony about coverage or value of the North Unit is not relevant.  "A successful bad-faith claim is like second base -- you can only get there if you reach first base by prevailing on the underlying breach-of-contract claim." *Briere v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 116 F.4th 32, 36 (1st Cir. 2024) (citing *Zarrella v. Minn. Mut. Life Ins. Co.*, 824 A.2d 1249, 1261 (R.I. 2003)).  The North Unit is not in play in this bad-faith claim—because there was no coverage, there was no breach; where there was no breach, there can be no bad faith.  Therefore, any testimony or documentary evidence about the North Unit is excluded from this phase of the case.

Even if the Court did find the document bore some significance to the claim here, IDC waived its right to rely on it.  First, the Policy required IDC to reference Endorsement 1 or produce it along with the Policy when it made its claim to Chicago Title, but IDC did not do so.  Second, Chicago Title produced this document many years ago during initial discovery, but IDC did not allege anything about Endorsement 1 in the Complaint.  IDC argues that it did not see it or recognize its

significance until recently because of the way it was produced but IDC concedes that it has had this document for years. Third, Endorsement 1 also says on its face that someone from Chicago Title must sign it for it to be valid and IDC has not produced a signed copy.[8]

Moreover, no one at IDC mentioned an endorsement being issued at any point in the state or federal court litigation that may have provided title insurance to their most valuable asset on Goat Island. After sixteen years of litigation and countless motions and oppositions where IDC took positions and advocated its cause, even if the Court could find that it is disputed that Endorsement 1 was effective,[9] any reference to or reliance on Endorsement 1 is waived. *See*, *e.g.*, *W.R. Cobb Co. v. V.J. Designs, LLC*, 130 F.4th 224, 240 (1st Cir. 2025) (enforcing waiver of theory where a party did not "advance[ ] such a claim ... prior to or during the trial itself").

The Court also excludes IDC's Expert McCullough's opinion that Chicago Title's alleged failure to extend the promises and affirmative coverage to IDC in the 1994 Policy that it issued to Globe Manufacturing in the 1988 policy was a breach of

---

[8] IDC's attorneys' files did not contain copies of a signed Endorsement 1 and IDC's Outside Attorney, who supposedly requested the endorsement, testified in 2011 that he did not recall any endorsement ever being issued. IDC argues that it was issued (because there is no evidence that it was NOT issued, and other endorsements were effective without signatures), and Chicago Title would have known that it was issued if it had not acted in bad faith in its investigation of IDC's claim. This circular argument made with no factual support is not enough to defeat Chicago Title's motion in limine.

[9] The Court finds it illogical that Chicago Title would have agreed to provide coverage for the North Unit through Endorsement 1 in February 1997 but refused to provide this coverage in December 1997. And if IDC believed that Endorsement 1 was valid and covered the North Unit, why would it later ask Chicago Title's AVP for that very coverage?

the covenant of good faith and fair dealing that resulted in IDC's loss of the North Unit. This theory relies on a breach of a promise that should have been contained in the 1994 policy; that has nothing to do with whether Chicago Title acted in bad faith when it investigated and eventually denied IDC's claim for title insurance. If anything, this failure to include promised coverage in the 1994 Policy would be a claim for a breach of that contract, not for a bad-faith refusal to pay or settle a covered insurance claim.

Therefore, as far as the testimony, expert or otherwise, speculating about promised coverage of the North Unit or its value, that ship has sailed. Any testimony or documentary evidence offering proof of coverage or value of the North Unit is excluded. The only remaining question as it relates to bad faith is whether Chicago Title's conduct leading to its denial of IDC's title claim as to the South and West Units was based on a coverage position that was fairly debatable. The Court GRANTS Chicago Title's Motion in Limine. ECF No. 184.

The Court now turns to Chicago Title's Motion for Summary Judgment.

## III.    MOTION FOR SUMMARY JUDGMENT

Chicago Title moves for summary judgment on Count III, arguing that the undisputed issues of material fact show that as a matter of law it did not act in bad faith in denying coverage as to the South and West Units. IDC opposes the motion,[10]

---

[10] Litigation is often borne out of conflict but "[n]ot all conflicts of fact will bar summary judgment." *Event Producers, Inc. v. Tyser & Co.*, 854 F. Supp. 35, 39 (D.P.R. 1993), *aff'd sub nom. Event Producers, Inc. v. Tyser & Co. N. Am.*, 37 F.3d 1484 (1st Cir. 1994). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

at the outset reminding the Court that bad faith is a fact intensive inquiry and, even when the ultimate trial is to the bench, seldom granted. But where "neither party has requested a jury trial" and "the Court has already considered the underlying breach of contract claim[,] [] [IDC's] contention that the Court cannot address the bad-faith claim fails." *Hauser v. Stonebridge Life Ins. Co.*, No. C.A. 10-423 S, 2012 WL 1941576, at *15 (D.R.I. Mar. 5, 2012), *report and recommendation adopted*, No. C.A. 10-423 S, 2012 WL 1936682 (D.R.I. May 29, 2012). Based on the record before the Court, and considering its extensive experience with these facts and the travel of the litigation, the Court finds that summary judgment[11] on IDC's bad-faith claim is appropriate here and so GRANTS Chicago Title's motion.

### A.    BAD FAITH

As the Court has determined, Chicago Title breached the Policy by denying coverage for the South and West Units. Now it must decide whether that decision was made in bad faith in accordance with Rhode Island law. "Insurers doing business in Rhode Island have an implied obligation to respond to their insured promptly and

---

otherwise properly supported motion for summary judgment, the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. at 247, 248, (emphasis in original); *see also Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7–8 (1st Cir. 1990). The Court notes that IDC only disputes or partially disputes eight out of fifty-nine statements of fact. *See* ECF No. 195.

[11] A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

fully, to investigate a claim and to subject that claim to appropriate review. An insurer has a responsibility to assemble all the facts necessary for a fair and comprehensive investigation *before* it refuses to pay a claim and may not base a defense to bad faith on later acquired information." *Skaling v. Aetna Ins. Co.*, 799 A.2d 997, 1010 (R.I. 2002). However, "an insurer is entitled to debate a claim that is fairly debatable." *Id.* at 1011.

Rhode Island's bad-faith statute provides that an insured may sue their insurer when "the insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance." R.I. Gen. Laws 1956 § 9-1-33(a). "[B]ad faith is established when the proof demonstrates that the insurer denied coverage or refused payment without a reasonable basis in fact or law for the denial." *Skaling*, 799 A.2d at 1010. It is within this legal framework that the Court turns to whether Chicago Title's conduct leading to its denial of IDC's claim was in bad faith in violation of § 9-1-33.

### 1. Reasonable Basis for Denial

Chicago Title gave several reasons rooted in the Policy language for denying IDC's claim, including late notice and failure to cooperate in the investigation. The Court will evaluate the undisputed facts as to each of these reasons to decide whether they were unreasonable.

15

### a. Late Notice

It is undisputed that the Policy terms allowed Chicago Title to deny coverage due to late notice. Early in the claims investigation, Chicago Title determined that IDC did not promptly notify it in writing in violation of the Policy terms. The Policy is clear that notice had to be in writing–and IDC did not let Chicago Title know in writing until 2005, six years after the *America* case in state court began. IDC argues however that Chicago Title's AVP knew about the *America* litigation while it was ongoing and followed its progress so any assertion that IDC violated the Policy by giving late notice and denying the claim based on it was done in bad faith.

But notice of a lawsuit, especially where the insured had not sought the insurer's representation, is not tantamount to official notice of a specific claim for coverage. This Court found after the bench trial that Chicago Title's AVP knew about the *America* case, but he did not understand that the litigation had any bearing on interests insured under the Policy because he did not believe that Chicago Title had insured the development rights as they existed under the Third Amendment. Moreover, even if the Court credits that Chicago Title's AVP had general notice, IDC made no attempt to get Chicago Title involved, instead choosing to hire different counsel.[12] That decision cannot now be used against Chicago Title as evidence of bad faith.

---

[12] It did not get Commonwealth, who had a policy on the North Unit, involved either.

IDC also argues that there are disputes about whether Chicago Title can prove that late notice caused prejudice and the extent of the prejudice.  In the denial letter, Chicago Title cited that it was deprived of the ability to investigate any claims when the details were fresh in people's minds, to research defenses to the title claim, to participate in settlement proceedings that IDC's Value Expert Roos was actively engaging in, and to assert its subrogation rights.  ECF No. 186-1 at 16.  And while the Court determined after the bench trial on breach of contract that Chicago Title had not met its burden of showing prejudice from the late notice, it does not follow that Chicago Title acted in bad faith by asserting this defense as one (of several) bases to deny coverage for the South and West Units.  *Skaling*, 799 A.2d at 1012 ("[N]ot every refusal to pay amounts to insurer bad faith.").  IDC "must demonstrate an absence of a reasonable basis in law or fact for denying the claim or an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation," and has, in the face of undisputed facts, did not do so.  *Id.*

Therefore, the Court finds that the record is undisputed that Chicago Title had a reasonable basis in law and fact to deny coverage.  *See Event Producers, Inc.*, 854 F. Supp. at 40.

### b. Failure to Cooperate

Chicago Title also cited IDC's failure to cooperate as a reason for denying its claim.  It is undisputed that IDC never provided a Proof of Loss, delayed in sending requested documents, and did not complete the EUO.  To survive summary judgment on a bad-faith claim, "there must be present in the record some indication that there

was either conscious wrongdoing on the part of defendants, some dishonest purpose, or the absence of any reasonable basis for denying benefit and the knowledge or reckless disregard of this lack by insurer." *Id.* (citations omitted).

Regarding its delays in document production, IDC implies that Chicago Title made a conscious decision to correspond with counsel it knew had moved on from his representation of IDC to later blame IDC for being unresponsive. First, this Court's decision on Count III does not entirely hinge on the timing of IDC's responsiveness to discovery and other correspondence. There is a dispute about whether Chicago Title sent the denial letter to the correct attorney but any delay in receiving the denial letter has nothing to do with whether Chicago Title's reasons for denying coverage were made in bad faith. ECF No. 195 ¶ 55. Second, it can be inferred that former counsel would send any correspondence to either IDC or its new counsel. And third, considering the length of the litigation, investigation, scope of the record, and legal standard for bad faith, a few short correspondence delays cannot lead a trier of fact to conclude that Chicago Title acted recklessly and unreasonably in finding that IDC was not cooperating.

As for the deposition, IDC's Value Expert Roos sat for the EUO in November 2006 but counsel for Chicago Title ended it before it was completed. Chicago Title tried to reschedule the EUO three times between December 2006 and April 2007 and each time, IDC canceled the EUO. IDC counters that IDC's Value Expert Roos remained available to be deposed, implying that Chicago Title acted in bad faith when it gave up its pursuit of a completed EUO. The does not support the assertion that

the way Chicago Title acted in terms of the scheduling and attempts to reschedule the EUO was an example of "conscious wrongdoing" or rooted in a "dishonest purpose." *Event Producers, Inc.*, 854 F. Supp. at 40.  After multiple attempts to reschedule the EUO, a lack of response from IDC, and after an extensive investigation including a legal review, it was not unreasonable or reckless for Chicago Title to conclude that it could deny IDC's claim because it had not cooperated.  *See id.* Therefore, Chicago Title's conclusion and subsequent denial of IDC's claim based on the permissible ground of failure to cooperate was not bad faith.

### 2. Intentional or Reckless Failure to Investigate the Claim and Subject it to Cognitive Evaluation

IDC argues that Chicago Title intentionally and recklessly did not properly investigate the claim and fairly evaluate and review the results of that investigation. IDC particularly focuses on its perception that Chicago Title seized onto the late notice defense to deny the claim, solely pursuing that as a reason to deny the claim instead of properly investigating whether there was coverage for the South and West Units.  To advocate its point, IDC notes that Chicago Title's SVP stated early on in the investigation process, "if there's a colorable defense, assert it."  That is not enough to establish a bad-faith claim.

The record shows that Chicago Title's investigation was extensive.  Though, in hindsight, it may not have focused on the areas that IDC wanted it to, it cannot be said based on the undisputed material facts that Chicago Title acted unreasonably, recklessly, or in bad faith.  The Court understands IDC's position that it does not believe Chicago Title gave its claim a fair shot, but insurers are entitled to question

19

claims and assert colorable defenses. *Skaling*, 799 A.2d at 1010 ("an insurer has the right to debate a claim that is fairly debatable.")

The Court finds from the undisputed material facts that Chicago Title's consideration of IDC's late notice of claim, which IDC's Value Expert Roos acknowledged made things worse for Chicago Title's position, was reasonable and it was not frivolous to debate whether it could deny the claim because IDC breached the Policy. A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact" because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Celotex Corp.*, 477 U.S. at 323. After the late notice of claim, in the face of two state court opinions, the Court cannot say that Chicago Title unreasonably denied IDC's claim or intentionally or recklessly did not properly investigate. "Accordingly, [Chicago Title]'s position meets the "fairly debatable" standard." *Shannahan v. R. I. Interlocal Risk Mgmt. Tr.*, 269 A.3d 737, 741 (R.I. 2022) (a claim was fairly debatable where there was a nonfrivolous debate about whether a claim had merit, plaintiffs did not establish an absence of a reasonable basis for denying the claim, or that the insurer intentionally or recklessly failed to properly investigate). Moreover, the Rhode Island Supreme Court has observed in state law bad-faith cases that "the sheer duration of the litigation [] constitutes another indicator that [the defendant's] conduct in this case did not constitute bad faith." *Id.* (citing Imperial Cas. & Indem.

Co. *v.* Bellini, 947 A.2d 886, 894 (R.I. 2008). This litigation has gone on for sixteen years–further proof that the claims here were fairly debatable.

## IV. CONCLUSION

First, the legal history of this case could not be clearer that the Chicago Title Policy did not cover title to the North Unit. No evidence or testimony about a claim for coverage or a bad-faith denial of non-existent coverage would be admissible at trial. Therefore, the Court GRANTS Chicago Title's Motion in Limine. ECF No. 184.

Second, although this case has represented years of very excellent advocacy between two parties who have not agreed substantively on much, the Court finds the record on this final summary judgment motion on the remaining claim for bad faith does not contain any genuine, material disputes of fact such that the Court can decide the bad-faith claim on the law. Chicago Title's actions in investigating and ultimately denying IDC's claim were reasonably based on the law and the facts and were not reckless. It exercised its right to debate a claim that was "fairly debatable;" as such, the Court GRANTS Chicago Title's Fourth Motion for Summary Judgment. ECF No. 185. The Court DISMISSES Count III of IDC's Complaint and will enter final judgment in this case, almost 17 years after it was filed.

IT IS SO ORDERED.

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

February 6, 2026